THOMAS ET AL. *v.* CORSO ET AL.
* * *
CORSO ET AL. *v.* MILLER ET AL.

[No. 201, September Term, 1971.]

*Decided March 17, 1972.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*William A. Ehrmantraut,* with whom were *Donahue & Ehrmantraut* on the brief, for Robert J. Thomas, part of appellants. *John H. Mudd,* with whom were *Semmes, Bowen & Semmes* on the brief, for Frederick Memorial Hospital, other appellant.

*George W. White, Jr.,* with whom were *Samuel D. Hill,*

*Buckmaster, White, Mindel & Clarke* and *Richard E. Zimmerman* on the brief, for Mida Belle Corso et al. No brief filed on behalf of Robert Lee Miller, Jr.

BARNES, J., delivered the opinion of the Court.

The appellants, Dr. Robert J. Thomas and Frederick Memorial Hospital, two of the defendants below, appeal from a judgment entered on May 17, 1971, against them for $99,609.24 by the Circuit Court for Montgomery County (John P. Moore, J.) in favor of the appellees, Mida Belle Corso, as surviving spouse of Faust Q. Corso, deceased, individually and as administratrix of her deceased husband's estate, and the five children of Mr. and Mrs. Corso. There was a verdict in favor of the remaining appellee, Robert Lee Miller, Jr., one of the defendants below: and a judgment was entered in his favor for costs.

The principal questions on this appeal are (1) whether the trial court erred in declining to grant motions for directed verdicts and for judgments n.o.v. in favor of (a) Dr. Thomas and (b) the Hospital; (2) whether the trial court erred in its instructions to the jury in regard to alleged contributory negligence of the decedent Corso as a bar to recovery against Dr. Thomas, and (3) whether this Court should remand the case for a new trial on the issue of liability for the introduction of additional evidence. We have concluded that the trial court did not err and that we should not remand the case for the purpose mentioned. We will accordingly affirm the judgment.

On the evening of January 8, 1969, Corso and John R. Lyons, employees of the Baltimore and Ohio Railroad Company, attended a union meeting of the Brotherhood of Railway Carmen (AFL-CIO) at its union hall in Brunswick, Maryland. When the union meeting concluded at approximately 8:30 p.m., Corso drove his automobile with Lyons as a passenger to a social gathering of the union being held at Coates Restaurant, located on

Maryland Route 180, approximately two miles from the union hall. When they arrived at the restaurant, Corso discovered that the restaurant parking lot was filled to capacity and Corso parked along the side of Route 180 opposite the front of the restaurant at approximately 9:15 p.m. While at the restaurant, Lyons testified that Corso consumed shrimp and two cups of beer. The cups would hold four to five ounces of beer. After purchasing some shrimp and ice cream for his family, Corso, with Lyons, left the restaurant at approximately 10:30 p.m. to go home in the Corso automobile. When they walked outside, it was sleeting. They then crossed the road to the parked automobile and began to prepare to clear the freezing rain from the front windshield and the rear window. Lyons was standing near the left rear fender of the car and Corso was near the left front fender. Both were standing approximately two feet off the paved portions of the road. While standing there, Lyons observed an automobile approaching from the west on the side of the road where the Corso car was parked. He warned Corso of the approach of this car, and Corso acknowledged his notice of the approaching vehicle. The next thing Lyons remembered was a loud sound. He turned and saw Corso flying through the air, as if rolled up over the fender of an automobile. He then saw him down the road about 35 or 40 feet. He did not see the car actually strike Corso. The automobile was driven by the appellee, Miller, who stopped some 100 feet from the point of impact and returned to the scene of the accident. Within a few minutes, State Trooper Victor E. Wolfe arrived. Miller claimed that he saw no one on the road where the collision occurred, but heard a thump when going between 35 and 40 miles per hour, after which he came to a stop down the road. Both Trooper Wolfe and Miller testified that Corso was lying in the road some 40 feet from the Corso automobile. The thump was a loud one and left a good sized dent in the right front fender of the Miller car some two or three feet from the headlight. The aerial was also broken.

When Lyons got to Corso, he found him unconscious with blood coming out of his nose and mouth. He heard that Corso had regained consciousness before the ambulance arrived. Trooper Wolfe found Corso conscious, vomiting on the highway and complaining of pain in his right hip.

The Hospital record indicates that Corso was brought to the Emergency Room at 11:10 p.m. in the Brunswick Ambulance. Miss Constance M. Halter, a registered nurse, who was on duty in the Emergency Room, checked Corso's blood pressure, pulse and respiration. In the Emergency Room record, written by Nurse Halter, she stated: "Was hit by an automobile. Complaining of 'numbness' in the right anterior thigh. Does not appear deformed and is able to move the right leg. Has abrasion of the frontal scalp." She noted, "p. 84, r. 26, B.P. 80/60." At 11:25 p.m. the record indicates B.P., "90/60"; at 11:35 p.m., "100/60." For treatment, she noted, "Demerol 100 mg. I.M. at 11:30 P.M., abrasion cleaned, Dr. R. J. Thomas at 11:25 P.M." with disposition to "200 Hall 11:45 P.M." Dr. Thomas signed the record but nothing was filled in for diagnosis. In explanation of the record, Nurse Halter explained that "I.M." meant "intramuscularly" and that the reference to Dr. Thomas meant that she telephoned him at 11:25 p.m. to notify him of this new patient, what happened, his complaints and his vital signs. This was done because it was her duty to notify the doctor on call of any patient coming to the Emergency Room and to tell him what happened to the patient, his complaints and vital signs and then to carry out the doctor's orders. All she knew about the collision was that Corso had been hit by an automobile and that was all she could tell Dr. Thomas about it. It had to be the doctor's decision on whether to admit the patient. Dr. Thomas instructed Nurse Halter to admit Corso as a patient and what to have done with him, as recorded on the "Doctors' Orders" sheet of the Hospital record. Nurse Halter denied that Dr. Thomas requested her to keep Corso in the Emergency Room for observation, as Dr.

Thomas testified, and hence she had Corso admitted and transferred to 2 Main Hall at 11:45 p.m. She also denied that Dr. Thomas had asked her whether he should see Corso or that she had told Dr. Thomas that she did not think he needed to see Corso, as Dr. Thomas testified.

The Hospital has no residents or interns. The medical staff consists of private practicing physicians. From the medical staff, service is provided for the Hospital's Emergency Room through a system of "on-call rosters." The physicians make themselves available on a voluntary, rotating basis to treat patients who are brought to the Emergency Room. After the Emergency Room Nurse has telephoned the physician then on-call of the incoming patient's vital signs, it is the duty of the physician to diagnose the patient's condition, prescribe treatment and to determine whether admission to the Hospital is necessary.

Nurse Halter testified that Corso had been covered with blankets. She did not take Corso's pulse after the initial finding of 84 because that seemed normal so that she was not concerned with it at the time. She was, however, concerned with his blood pressure as indicated by the fact that she took it every 10 minutes and admitted that her first blood pressure reading was low. She denied that she told Dr. Thomas of the blood pressure reading of 100/60 as he testified she did. Her recollection would appear to be correct in that the 100/60 reading was taken at 11:35 p.m., whereas she telephoned Dr. Thomas at 11:25 p.m. when the blood pressure reading at 11:15 p.m. was 80/60 and at 11:25 p.m. was 90/60. This is important in view of Dr. Thomas' testimony that any blood pressure under 100 is "definitely low."

The Hospital was filled to capacity because of an influenza epidemic, so that no rooms were available for Corso. He was transferred from the Emergency Room to 2 Main Hall at 11:45 p.m. by a hospital orderly and placed in the hall outside the nurse's station. Mrs. Peggy Lou Strawsburg, a general duty nurse, and Mrs. Kathryn Nussbaum, the assistant nurse supervisor, attended

Corso. Nurse Strawsburg checked his vital signs. His blood pressure was 70/50, his pulse 120 and his respiration 40. She stated that Corso complained of pain but appeared to be rational. She knew Corso had, on Dr. Thomas' instructions over the telephone, been given 100 milligrams of Demerol, the maximum dose. She also knew that Demerol "will depress blood pressure." She noticed that Corso's skin was cool and perspiring, his breathing deep but rapid. At 12:15 a.m. he was asking for water frequently, his skin was warmer, he seemed to be more comfortable, but pain was still present. She noticed a strong odor of alcohol. At that time Corso was talking to his wife. Her notes indicate that at 12:30 a.m. his blood pressure was 89/70. At 1:00 a.m. it was 94/70 with a pulse of 100 and respiration of 28, with a stronger pulse and continuing pain in the right thigh. At 1:30 a.m. he was quieter until 2:00 a.m. when she found Corso breathing very poorly in Cheyne-Stokes manner with no pulse. The attempts at pulmonary resuscitation proved to be ineffective. Dr. Thomas pronounced Corso dead when he arrived at the Hospital at 2:30 a.m.

Nurse Nussbaum saw Corso for a few minutes after midnight in the 2 Main Hall. He complained to her of his right leg. She checked and saw nothing unusual. He asked her for water, but she refused to give it to him because he had been drinking. She recalled that Nurse Strawsburg had said that she was concerned about his blood pressure of 70/50. She paid little attention to his abnormal vital signs and his requests for water because he had been given Demerol and had been drinking. The next time she saw Corso was during the giving of cardiac pulmonary resuscitation by Nurse Strawsburg and Miss Dalgarn, a Registered Nurse.

Dr. Thomas, a general surgeon, was on-call the evening of the accident. This required him to be available on short notice during the 24 hour on-call period to handle situations arising in the Emergency Room fitting his category. That evening he had eaten dinner, watched T.V. and gone to bed. He had not had anything to drink. He was asleep

when Nurse Halter telephoned him about 11:30 p.m. He was at his home—some 10 minutes from the Hospital— the entire time Corso was there until he received the second call after 2:00 p.m. that Corso was dying. He testified that Corso was admitted to the Hospital as his patient and that his patients' health depended upon his professional ability. He further stated that it was his responsibility to see to it that Corso was properly diagnosed and treated and to make himself physically available, if necessary, to any surgical patients coming to the Emergency Room without a private physican. He also stated that Corso was never seen by a physician until he arrived at the Hospital around 2:30 a.m. and pronounced him dead.

When Dr. Thomas arrived at the Hospital, he observed the deformity of Corso's leg, shortened and turned outward, which indicated the possibility of a fractured hip, a condition sufficiently serious to require immediate treatment. He admitted that Corso had no other accident while in the Hospital and that the fractures later found on the autopsy were present when Corso arrived at the Emergency Room as a result of his initial injury. It was his opinion that the fractures had changed position and became clinically apparent after Corso left the Emergency Room, so that he would not have seen any more in this regard than did Nurse Halter, although he would likely have made a more thorough examination. Dr. Thomas ordered that Dr. Robert J. Furie, a competent physician and pathologist, perform an autopsy upon Corso.

The autopsy revealed that Corso had a lacerated liver, a "badly comminuted" fracture of the left femoral neck in the hip area with overriding, external rotation and hemorrhage. It also showed badly comminuted fractures in the pelvic area with jagged fragments penetrating the peritoneal cavity as well as fracture and separation of the coccyx from the sacrum with extensive hemorrhage around these fractures. The vital organs showed no signs of pre-existing disease. Both Dr. Thomas,

as Medical Examiner, and Dr. Furie certified that the cause of Corso's death was "traumatic shock, fractured femur and pelvis."

Dr. Thomas testified that upon the first call by Nurse Halter, he had been told that Corso had been struck by an automobile, was complaining of numbness in his right thigh, had an abrasion on his forehead, was conscious, and had a blood pressure reading of 100/90 with a pulse of 80-84. He later testified that he was advised by Nurse Halter of all three blood pressure readings of 80/60, 90/60 and 100/60 at the time of the first call and that Nurse Halter stated in answer to a specific question that she did not believe he needed to see Corso. As we have observed, Nurse Halter denies that she stated this or gave Dr. Thomas the blood pressure reading of 100/60. He denied that he was told that Corso had "pain" in his thigh although he had admitted that he had inadvertently stated this in his deposition. At first he differentiated between "pain" and "numbness," stating that "pain" aggravates shock and is a specific complaint as compared with a vague complaint of "numbness." When confronted with his deposition testimony that he was told of the pain complaint, he stated that it would have made no difference to him. He stated:

"When I got my first call from the emergency room that he was complaining of pain or numbness, I think it is not a major point in my judgment how I would have handled the situation. I still would have done the same thing, everything else taken into consideration."

Dr. Thomas also stated that it is difficult for a patient to explain his complaint.

After receiving the information from Nurse Halter over the telephone, he instructed her to admit Corso for observation and x-rays in the morning and gave a list of orders, including the administration of 100 milligrams of Demerol because Corso appeared to be unsettled. He ordered Corso to be kept in the Emergency Room for ob-

servation (This was denied by Nurse Halter.) because the Emergency Room was usually quieter, had observation rooms and Corso could best be observed there. Dr. Thomas also testified:

"My experience in treating any patient that comes into the emergency room that has had trauma: I try as a rule if I can to keep everybody for a period of observation. This observation may be for an hour or two hours, a couple or hours or overnight or two or three days. This is a practice I have because I know from my experience that what appears to be in an original evaluation may change. I like to have the patient where I know about it, where I can do something about it rather than say, 'Go home and come back tomorrow,' or something like that."

Dr. Thomas recognized that fractures can be present even though no deformities are present or limited motion is exhibited. He also recognized that Corso "may have fractures" and that this was one of the reasons why Corso was kept for observation.

Dr. Thomas knew nothing of what happened to Corso between 11:30 p.m. and 2:15 a.m. other than what he learned from the nurses and from the Hospital record. When he arrived at the Hospital, the nurses told him that Corso had seemed fine, was asking for a urinal and suddenly went into a state of collapse. He had only received two telephone calls in regard to Corso. He insisted that the physician on call cannot see or be with every patient but must rely upon the nurses to make the clinical observation on which he can make his judgments. He relied upon the information given him by Nurse Halter and especially her statement (denied by her) that Corso seemed in satisfactory condition and did not need to be seen by him. He stated that he was no more competent than the nurse to make observations but was more competent to put the observations all together to make a diag-

nosis. He never made a diagnosis in regard to Corso although the Hospital rules require a provisional diagnosis before admission where necessary, and in the case of an emergency, as soon after admission as possible. When asked why he did not submit a bill for professional services to his patient Corso, Dr. Thomas stated:

"I didn't do anything, I mean—right—I didn't do anything."

Dr. Thomas strongly contended, however, that he should have been notified at 12:05 a.m. of the significant change in Corso's vital signs by the nurses in charge of him, in that those changes were positive symptoms of shock which required his immediate care and attention. To a trained nurse the findings at 12:05 a.m. would indicate a critical condition and that Corso's life was then in jeopardy although not in danger of immediate death. Corso "definitely needed the attention of a physician at that time." It is a standard procedure and customary practice for nurses as part of the team to advise the physician of any significant change in vital signs, so that it was unnecessary for him to have that written as an order or for him to call back and inquire how his patient was. He further stated that, had he been notified of the change in Corso's vital signs, he would have gone to the Hospital immediately and detailed what he would have probably done for a patient in shock which agreed with the treatment indicated by Dr. Furie. Dr. Thomas declined to say for sure that he could have then saved Corso's life in that "Only God knows the answer to that question," but he did state that he "might have", and further that the lack of treatment at that point increased the danger of Corso's losing his life. He said that it would be fair to say that he had treated people with symptoms that bad and that he had saved their lives.

Dr. Furie testified that, in his opinion, Corso's chance for survival was linked to the treatment he received. He described "shock" as a symptom complex involving the ineffective flow of blood to the tissues so that in suffering

both a lack of nutriment and removal of waste, the tissues become sick everywhere in the body and, if not remedied, tissue death will follow. It is vitally important to treat shock early in that experience has shown that if this is not done promptly and effectively, it becomes irreversible so that recovery is not frequent. It is immediately urgent when confronted with the symptoms of shock to take all appropriate measures to prevent it from slipping into irreversibility. Dr. Furie gave the symptoms of shock as a lowering of blood pressure, weakness, perspiration, rapid pulse, rapid respiration, diminished perception by the senses including pain, urgent thirst and apprehensiveness. He further stated that a systolic blood pressure (the higher of the two tests) of less than 100 is inadequate and is a danger sign requiring a physician's attention. A pulse of 120 at 12:05 a.m. was too rapid. In treating shock, it is important to relieve pain.

In Dr. Furie's opinion Corso needed the immediate attention of a physician from the time he arrived at the Hospital, not only because of his low blood pressure at that time, but because he had been struck by an automobile. He reasoned that personal treatment was necessary, as contrasted with telephone treatment, by stating:

"The physical forces involved in the vehicular accidents are of such a magnitude that you must presume the possibility of injuries, visible or not. * * * Because of the magnitude of the injury possibilities, meaning what might happen as a result of the accident, it takes a very skillful judgment to decide when in fact life threatening damage has occurred, such as internal bleeding, which would not be visible but have to be detected, or shock, all those life threatening consequences of a force of an accident. * * * In reaching an assessment of how seriously injured the patient might be, a great many things enter into that judgment. And the physi-

cian in physical presence can exercise his senses to synthesize a judgment from that input, that it would be dangerous to do it through somebody else's judgment and senses."

In considering the vital signs registered at 12:05 a.m., Dr. Furie testified that as a physician he would have wanted to have been advised of them, in that they indicated "a very precarious, life-threatening situation that demands immediate treatment." In his opinion, however, Corso could well have been in shock with a blood pressure reading of 100/60 and that vital signs should be determined very frequently, at least every 15 minutes for persons having the symptoms of shock. He further testified that, in his opinion, Corso's impaired breathing did not come on suddenly but gradually because the "very nature of the mechanism precludes a sudden onset of Cheyne-Stokes."

Nurses Strawsburg and Nussbaum challenged the claim of Dr. Thomas that it was routine, customary practice to notify the physician of significant changes in the vital signs of a patient, unless those changes did not improve. However, both nurses admitted that they would call the physician if they believed that a patient was in shock, and that the blood pressure reading of 70/50 at 12:05 a.m. was a shock blood pressure, as were the other findings at that time, especially the pulse of 120. Both nurses knew that Corso was asking for water but they gave little, if any, thought to their knowledge that thirst is a symptom of shock because Corso had been drinking. Dr. Thomas, however, testified that drinking by Corso had nothing to do with his judgment. Both Dr. Thomas and Dr. Furie testified that the alcoholic content of Corso's blood was found to be .05% by the State Medical Examiner's Office. This alcoholic content does not indicate intoxication under the Maryland law, which was stated to be .15%.

## 1 (a)

Dr. Thomas earnestly urges us to hold that the trial

court erred in failing to grant his motion for a directed verdict and his motion for a judgment n.o.v. for three reasons, *i.e.,* (i) the plaintiffs below failed to establish by expert evidence the standard of care in medical malpractice cases in the Frederick area and the violation of such a standard of care; (ii) failed to establish the causal connection between the alleged negligence and the injury to Corso; and, (iii) failed to establish that the alleged negligence was the proximate cause of Corso's injury. We shall now consider these contentions in the order indicated.

### (i)

Although in many medical malpractice cases expert testimony is required to be introduced by the plaintiff to establish the standard of care in the locality involved, see *Johns Hopkins Hospital v. Genda,* 255 Md. 616, 258 A. 2d 595 (1969), involving an intricate open heart operation and a broken fragment of needle left in the patient's chest, it is well recognized by the Maryland cases that there may be cases in which no expert testimony is required to establish the standard of care or its breach by the physician. We discussed the law in this regard in *Central Cab Co. v. Clarke,* 259 Md. 542, 551-52, 270 A. 2d 662, 667-68 (1970). We stated:

> "The situation in the instant case [involving the malpractice of an attorney in failing to notify his client of his termination of employment whereby a default judgment was obtained against the client] is analogous to cases involving medical malpractice in which a dentist pulled the wrong tooth, and our predecessors held in affirming a judgment for the plaintiff that there was no necessity for expert testimony to establish that a dentist should not pull the wrong tooth. *McClees v. Cohen,* 158 Md. 60, 148 A. 124 (1930). The same rule applies in cases in which physicians have done an obviously negligent act such as accidentally ampu-

tating the wrong arm, or negligently leaving a sponge in a patient's body. *Rural Educational Ass'n v. Bush*, 42 Tenn. App. 34, 298 S.W.2d 761 (1956) and *Fredrickson v. Maw*, 119 Utah 385, 227 P. 2d 772 (1951).

"In *Butts v. Watts*, 290 S.W.2d 777, 779 (Ky. 1956), it was stated: 'There is a limitation on the rule that expert testimony is essential to support a cause of action for malpractice where the common knowledge or experience of laymen is extensive enough to recognize or infer negligence from the facts.'

"See also *Johns Hopkins Hospital v. Genda*, 255 Md. 616, 258 A. 2d 595 (1969) holding that expert testimony was necessary in that medical malpractice case involving a complicated operative technique in regard to heart surgery, but contrasting that case with medical malpractice cases of carelessly dropping a scalpel or knife on a patient causing him to be cut or dropping acid carelessly on a patient causing him to be burned."

In 1 Louisell and Williams, *Medical Malpractice,* § 8.05, pp. 206-07, it is stated:

"The duty to attend the patient after a physician-patient relationship has been established is a clearly defined specific duty within the general duty of due care. A physician cannot properly withdraw from a case under diagnosis or treatment without giving reasonable notice. How much attention a particular case may require in order to satisfy the standard of reasonable care, often is a matter for expert evidence. *It requires no expert evidence, however, to show that failure altogether to attend a patient, when common sense indicates that without attention the consequences may be serious, is not reasonable care.*" (Emphasis supplied.)

See also *Fink v. Steele,* 166 Md. 354, 361, 171 A. 49, 52 (1934) ; 81 A.L.R.2d 597, "Necessity of expert evidence to support an action for malpractice against a physician or surgeon."

The word "attend" has a variety of meanings, but one of them is "to visit professionally, as a physician." See *Webster's New International Dictionary,* Second Edition, p. 178. Although personal presence of the physician is obviously not required in all cases, there are cases where such presence is obviously required and a layman can, without expert assistance, reasonably conclude that the failure of the physician to be present personally with his patient is negligent. The present case, in our opinion, is such a case.

There is no dispute that Dr. Thomas was told by Nurse Halter that Corso "had been hit by an automobile." Dr. Thomas, himself, admitted that Nurse Halter told him that Corso "had been struck by a car" and was complaining of "numbness in the right thigh" and had an "abrasion on his forehead." It was obvious that Corso had not suffered a slight or insignificant collision with an automobile but that it was likely that he might well have suffered substantial internal injuries. The size, weight and force inherent in the operation of an automobile are generally understood by laymen as well as the probability of serious internal injury and fracture of bones likely to result from a collision of an automobile with a human body. Dr. Furie's opinion—already set forth in full—that the physical presence of the physician is required when a patient has been struck by an automobile in view of the presumption of the possibility of injuries, visible or not, with possible life-threatening internal injuries and bleeding, represents a view which a reasonable layman also shares and, as a matter of common sense, the physician should be physically present to examine the patient and thus make an informed and professional judgment in regard to his patient's condition as a result of the collision from his own senses, rather than by the senses of someone else.

Then, too, Nurse Halter testified that the Doctor on-call generally comes to the Hospital to look at a patient in the Emergency Room after an automobile accident, although not always. Dr. Thomas, himself, testified that only 30% of all patients coming into the Emergency Room are not directly seen by a physician, but he did not specify in regard to those who were struck by automobiles.

When additional facts are considered, it is well established that when we have before us the contention that there was no legally sufficient evidence to go to the jury or that the refusal of the trial court to grant a judgment n.o.v. after a jury verdict for the plaintiff was in error, we must resolve all conflicts in the evidence in favor of the plaintiff and give them the benefit of all reasonable inferences to be derived from the evidence favorable to them. *Katz v. Holsinger*, 264 Md. 307, 286 A. 2d 115 (1972).

There are important conflicts between the testimony of Dr. Thomas and that of Nurse Halter in regard to what Nurse Halter told Dr. Thomas over the telephone on the original call at 11:25 p.m. As we have already stated in some detail, Dr. Thomas stated that he asked Nurse Halter whether he needed to see Corso and that she stated that she did not believe he needed to see him. She, however, specifically denied that he asked the question or that she made any such statement attributed to her by Dr. Thomas. We must, therefore, assume the truth of Nurse Halter's testimony so that Dr. Thomas, for the purposes of the instant case, was not told that his physical presence to attend Corso was not needed. Nurse Halter also denied that Dr. Thomas gave instructions that Corso be kept in the Emergency Room for observation—as he stated he had—so that, again, we must assume that no such instruction was given.

Then, too, Nurse Halter denied Dr. Thomas' statement that she had stated during the first telephone conversation at 11:25 p.m. that Corso had a blood pressure of 100/60. She pointed out that she did not take Corso's

blood pressure showing 100/60 until *11:35 p.m.* or *after* she had talked to Dr. Thomas. Again, we must assume the truth of Nurse Halter's statement. The jury might reasonably have inferred that, inasmuch as Dr. Thomas indicated that Nurse Halter had given him Corso's blood pressure during the first telephone conversation, she actually gave him the blood pressure readings she had, *i.e.,* 80/60 at 11:15 p.m. and 90/60 at 11:25 p.m. Indeed, Nurse Halter testified that she gave Dr. Thomas Corso's "vital signs" during the 11:25 p.m. telephone conversation. Dr. Thomas admitted that "a blood pressure under a hundred is definitely low although some people do have a blood pressure normally of 90." He also admitted that Nurse Halter stated that "the patient appeared to be unsettled." He stated that he knew that "Demerol in my experience has lowered blood pressure. It can do it." Yet he ordered the giving of 100 milligrams of Demerol to a patient with a blood pressure he knew to be "definitely low," knowing that this drug would likely lower it further. By 12:05 a.m. Corso's blood pressure had dropped to 70/50; and, at that time, Dr. Thomas conceded that Corso was "exhibiting signs and symptoms of shock." Such a drop in blood pressure appears to be foreseeable under all of these circumstances and by Dr. Thomas' admissions.

It should also be kept in mind that there was no reason why Dr. Thomas could not have gone to see and examine Corso who was only 10 minutes away. Dr. Thomas was not engaged in seeing another patient. He was at home and, indeed, came to the Hospital in quick order after being notified that Corso was *in extremis,* arriving after he had died.

### (ii)

Dr. Thomas further contends that the plaintiffs failed to establish the causal connection between Dr. Thomas' alleged negligence and Corso's death. We do not agree with this contention.

On this point, Circuit Judge Sobeloff in *Hicks v. United States,* 368 F. 2d 626, 632 (4th Cir. 1966) aptly stated:

"When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable. Rarely is it possible to demonstrate to an absolute certainty what would have happened in circumstances that the wrongdoer did not allow to come to pass. The law does not in the existing circumstances require the plaintiff to show to a *certainty* that the patient would have lived had she been hospitalized and operated on promptly." (Emphasis in the original opinion)

Dr. Thomas' admission that he believed he might have helped Corso, might have revived Corso if he had been called at 12:05 a.m. and that lack of treatment by a physician increased Corso's danger of losing his life, together with Dr. Furie's testimony that Corso's chance for survival was linked to treatment and that shock must be promptly and effectively treated or it will become irreversible, are sufficient to justify a jury finding of a substantial possibility of survival which was destroyed by the failure of Dr. Thomas to examine, diagnose and treat Corso at any time after Corso arrived at the Emergency Room and was accepted by Dr. Thomas as his patient.

### (iii)

Dr. Thomas also contends that if it be assumed that he was negligent, there must exist not only a causal connection between the negligence complained of and the injury suffered, but further that the connection must be by a natural and unbroken sequence—without intervening efficient causes—so that but for the negligence of the defendant, the injury would not have occurred. The defendant's negligence must not only be a cause but must

be a proximate cause of the injury, citing *Suburban Hospital Association, Inc. v. Mewhinney,* 230 Md. 480, 187 A. 2d 671 (1963). Dr. Thomas urges that the proximate cause of Corso's death was either the intervening cause of the negligence of the on-duty nurses or the inevitability of death due to the nature of Corso's injuries. He contends that his "uncontradicted" testimony establishes this. We do not see it that way. Dr. Thomas did testify that Corso's condition had worsened by 12:05 a.m. and that he should have then been called by the nurses in that Corso was then exhibiting signs and symptoms of shock, but was not called; and this was an intervening act of sufficient negligence which broke the chain of causation between his negligence and Corso's death. It is correct, as Dr. Thomas observes, that having been called by the plaintiffs as an adverse witness, the plaintiffs are bound by his testimony unless contradicted or discredited. See *Nizer v. Phelps,* 252 Md. 185, 203-04, 249 A. 2d 112, 122-23 (1969) and cases therein cited. But as we pointed out in *Nizer,* the testimony of the adverse witness may be contradicted or discredited by circumstances as well as by the statements of other witnesses and a jury is not bound to accept the testimony of the adverse witness if it contains improbabilities or if there are reasonable grounds for concluding that such testimony is erroneous.

From what we have already stated, the jury could have reasonably concluded that under the circumstances of this case that if Dr. Thomas had performed his duty to attend Corso personally shortly after he was telephoned at 11:30 p.m., Dr. Thomas might well have been able to have saved his life and that this negligent conduct was one of the direct and proximate causes of Corso's death, concurrent with the negligence of the nurses. As Judge Horney, for the Court, stated in *Hillebrecht v. Stein,* 245 Md. 93, 96, 225 A. 2d 44, 46 (1966) :

> "As stated in the *Yellow Cab-Bonds* case [*Yellow Cab Company v. Bonds,* 245 Md. 86, 225 A. 2d 41 (1966)] there can be two proxi-

mate causes of an accident, each of which in and of itself, regardless of the fact that another tort-feasor was equally negligent, could warrant a finding of liability on the part of the wrongdoer. *Armiger v. Baltimore Transit Co.,* 173 Md. 416, 196 Atl. 111 (1938)."

We see no error on the part of the trial judge in denying the motions of Dr. Thomas for a verdict in his favor and for a judgment n.o.v.

## 1 (b)

We now turn to the contention of the Hospital that the trial court erred in declining to grant its motion for a directed verdict and for a judgment n.o.v. We perceive no error.

At 12:05 a.m. the vital signs indicated that Corso was in shock. Nurse Halter stated this, as did Nurse Strawsburg. When Nurse Strawsburg was asked that, in view of symptoms of shock, did the thought ever occur to her to call the doctor, she replied, "I'm not saying the thought did not occur to me." The jury might well have rejected the rather lame excuses made by the nurses that they did not call Dr. Thomas because Corso had been given Demerol and had prior to admission to the Hospital consumed alcohol and they were waiting to see if he improved before calling the Doctor. The jury may well have thought that in view of the admittedly low blood pressure, the administration of the maximum dose of Demerol with the presence of some alcohol in the patient's blood stream —both depressants—these factors were *added* reasons to call the physician when the signs of shock were clearly present. Indeed, Nurse Nussbaum admitted that she heard Nurse Strawsburg say that she was concerned about Corso's blood pressure of 70/50.

Dr. Thomas made it clear in his testimony that he worked with the nurses as a team. He stated that it was standard hospital routine for the nurses to notify the physician of significant changes in vital signs and that

the nurses should have notified him of the significant changes in Corso's vital signs at 12:05 a.m. in order that he could have come to the Hospital and instituted immediate treatment. Dr. Thomas was obviously qualified to testify in regard to the routine standard for communication by nurses working with him in the Hospital. The findings of the nurses at 12:05 a.m., in Dr. Thomas' opinion should have indicated to them that Corso was in a critical condition. Dr. Furie's testimony generally corroborated Dr. Thomas' position.

As we have already observed, Dr. Thomas testified that, in his opinion, he might have helped Corso and might have arrested the shock if he had been telephoned by the nurses at 12:05 a.m. and had been given Corso's vital signs at that time. He further stated, in effect, that the lack of treatment by a physician increased Corso's danger of losing his life. As mentioned, Dr. Furie testified that, in his opinion, Corso's chance for survival was linked to treatment and, further, that shock must be treated promptly and effectively as otherwise it becomes irreversible and death is likely to ensue. As mentioned, Dr. Thomas was obviously competent to testify in regard to the obligation of the nurses to telephone him at 12:05 a.m. and this was obviously the standard of care required of nurses in the locality involved and, indeed, the very Hospital which employed the nurses. The jury could find from the testimony that the Hospital was liable for the negligence of its nurses in their failure to telephone Dr. Thomas at 12:05 a.m. and report Corso's vital signs at that time. See *Cooper v. National Motor Bearing Co.,* 136 Cal. App. 2d 229, 288 P. 2d 581, 51 A.L.R.2d 963 (1955) and the annotation following that case entitled, *Nurses liability for her own negligence or malpractice,* 51 A.L.R.2d 970, 972-73. One of the grounds for submitting the issue of the negligence of the nurse and, consequently of her employer, to the jury in *Cooper* was the failure of the nurse to refer the patient to a physician for diagnosis and treatment under the facts of that case.

The testimony in regard to Corso's vital signs at 12:05 a.m. and of Dr. Thomas and Dr. Furie is sufficient to enable a jury to find a causal connection between the acts of the nurses and Corso's death.

The judgment against the Hospital having been less than $100,000 ($99,609.24), there is, of course, no claim for any possible limitation of damages pursuant to Code (1971 Repl. Vol.) Art. 43, § 556A. See Footnote 1 in *Cotham and Maldonado v. Board of County Commissioners for Prince George's County,* 260 Md. 556, 558-59, 273 A. 2d 115, 116-17 (1971).

In our opinion, the trial court, in the light of the testimony, properly declined to grant the motions of the Hospital for a directed verdict and for a judgment n.o.v.

2

The trial court instructed the jury, in effect, that the defense of contributory negligence was not available to Dr. Thomas and the Hospital, but was available to Miller. Dr. Thomas excepted to this portion of the charge, apparently, but not too clearly, on the ground that inasmuch as the cause of death on the autopsy report was stated to be "multiple factures and shock," Corso's "alcoholic condition" at the time of the accident contributed not only to the occurrence of the accident but also "masked out" the sense of pain a "sober person" would have felt in a similarly injured condition so that the symptoms relative to fracture were not readily apparent to the nurses, and consequently to Dr. Thomas, thus preventing an effective diagnosis and evaluation of Corso's condition.

The short answer to this contention is that there was no evidence in the case that Corso was "intoxicated." The evidence suggests the contrary. Lyons testified to the drinking of two beers by Corso during the social hour and there was no evidence that any beverage containing alcohol other than beer was available. Then, too, Dr. Thomas ultimately testified that even if he had known of any consumption of alcohol by Corso, it would not have

made any difference in his "diagnosis and treatment." We see no error in the charge in this regard.

### 3

Both Dr. Thomas and the Hospital contend that, in any event, the case should be remanded without affirmance or reversal, pursuant to Maryland Rule 871 a, to the trial court in order to permit the introduction of additional evidence.

The contention arises in a somewhat unusual way. The trial court, upon its own motion, directed that there be a bifurcated trial pursuant to the provisions of Rule 501 a so that the issues in regard to liability should be first tried by a jury and if any defendants were found to be liable to the plaintiffs, issues in regard to damages should be later tried by a jury. This was done. In the "liability case" (December 2 - 9, 1970), the trial court directed a verdict in favor of Interstate Bridge Company, Miller's employer, and the jury found that there was no negligence on the part of Miller causing Corso's injuries.

Thereafter the "damage case" came on for trial on May 10, 1971, and lasted for two days. Toward the end of the trial of the "damage case," Dr. C. T. Byron Kao, who had acted as Corso's personal physician, read an account of the trial in a newspaper and telephoned Dr. Thomas indicating that he had facts concerning Corso which he would be willing to testify to in the pending "damage case." Dr. Thomas then requested that Dr. Kao drive from Brunswick to Rockville to testify. Dr Kao did this and appeared at the Court House in Rockville at 9:45 a.m., meeting counsel for Dr. Thomas for the first time. Dr. Kao was forthwith called as a witness by counsel for Dr. Thomas, although he had not been listed in the answers to Interrogatories requesting a list of witnesses who would testify for Dr. Thomas. Dr. Kao was permitted to testify and stated that he had often treated Corso for alcoholism from October 11, 1962, until January 4, 1969. He also treated Corso for minor railroad accidents and other ailments, including chest.pain, ner-

vousness, indigestion and high blood pressure (at one time 180/80). In his opinion, Corso's general health at the time of the accident involved in the instant case was not as good as the average person of his age in that his physical condition was weakened by his excessive drinking. Dr. Kao also stated that Mrs. Corso knew of the treatments of her husband for alcoholism. His treatment of Corso consisted of the administration of "tranquilizers to quiet him down."

Dr. Kao also testified that he had been on the courtesy staff of the Hospital for some 14 years. He had not talked with counsel for any of the parties prior to giving his testimony. His testimony indicated that Corso had periodic difficulties with excessive drinking.

Dr. Thomas makes the point that Corso's "alcoholic condition" was material to the question of liability in that it could establish a contributory negligence defense for Dr. Thomas and that he should have the opportunity to make certain that which admittedly at the present time is "speculative in nature." Then, too, Dr. Kao's testimony could have been used to contradict the testimony of Corso's widow and son that Corso was in general good health prior to the accident and did not drink to excess.

This contention, however, was not preserved for appellate review inasmuch as it was not tried and decided by the lower court. Maryland Rule 885. After the substance of Dr. Kao's testimony was disclosed on May 11, 1971, neither Dr. Thomas nor the Hospital moved to reopen the "liability case" or to take any other action in regard to Dr. Kao's testimony. They decided, apparently as a matter of trial tactics, to go forward with Dr. Kao's testimony in the "damage case" possibly with the hope that his testimony would result in a lower award of damages than would be awarded without his testimony. The jury rendered its verdict on May 11, 1971. No motion for a new trial was filed by either Dr. Thomas or by the Hospital. Judgment was entered on May 17, 1971, and there were no motions or other papers filed in the case until Dr. Thomas filed his appeal to this Court on June

2, 1971, from the judgment. The Hospital filed its appeal on June 14, 1971. Dr. Thomas' motion for a new trial, filed on December 11, 1970, after the jury had answered issues in the "liability case" on December 9, 1970, indicating liability on his part, did not, of course, present any ground based on Dr. Kao's testimony which was not known to exist at that time. See Rule 567 b.

Dr. Thomas and the Hospital also seek a remand for a new trial on the question of liability to have the trial court consider a revised Death Certificate and Affidavit of Dr. Russell Fisher, Chief Medical Examiner for the State of Maryland, dated September 21, 1971, apparently as "newly discovered evidence." In the revised Death Certificate, the words "Traumatic Shock" as one of the causes of death was stricken out and the words "Fat Embolism" inserted above the stricken out words. Dr. Fisher's Affidavit is as follows:

"Before me, this *21st* day of *September*, 1971, appeared Russell Fisher, M.D., Chief Medical Examiner for the State of Maryland and did make oath in due form of law as follows:

"That he was advised of the death of Faust Quido Corso and the autopsy finding subsequent to May 1971; that he has now reviewed the hospital record and autopsy finding and personally examined the slides prepared by Robert Furie, M.D., the pathologist who performed the autopsy; that on examination of the said slides, particularly those of the lung tissue, he found evidence of fat emboli; that from his review of the hospital record, the autopsy findings and his findings on microscopic examination he has determined that the cause of death of the deceased was fat embolism and not traumatic shock; that in the deceased's case pulmonary fat embolism caused disturbances within the lung and affected the resistance of blood flow through the pulmonary vascular bed; that the heart was not

> able to compensate for the sudden increase in resistance to the flow and death ensued due to heart failure; that clinical diagnosis of fat embolism is extremely difficult particularly in the first twelve hours following injury, even though it occurs in more than 80% of all who die from long bone and pelvic fractures; that even when diagnosed no specific therapy is available; that the rate of fatalities in clinically recognized cases is as high as 30%."

The revised Death Certificate and Affidavit of Dr. Fisher were never presented to the trial court by any motion for a new trial or otherwise but were merely inserted in the record in this case by counsel for Dr. Thomas and the Hospital. Here again, the point or question was not preserved for appellate review. Rule 885.

Finding no error and that the questions in regard to a remand, without affirmance or reversal, were not preserved for review by us, we shall affirm the judgment.

*Judgment affirmed, the appellants to pay the costs.*