Imre **BESSENYEI**

v.

Salvatore **RAITI, M.D., et al.**

No. CIV. JFM–01–1029.

United States District Court, D. Maryland.

June 9, 2003.

---

Jennifer S. Lubinski, Kenneth Mark Berman, Berman Sobin and Gross LLP, Gaithersburg, MD, Robert B. Adams, Mordhorst and Adams, Fairfax, VA, for Plaintiff.

Craig B. Merkle, Teri Kaufman Leonovich, Goodell DeVries Leech and Dann LLP, Lauren N. Schultz, Miles and Stockbridge PC, Baltimore, MD, Christian Levine Simpson, Cynthia L. Santoni, Miles and Stockbridge PC, McLean, VA, Ronald Uptown Shaw, Anthony J. Breschi, Shaw and Morrow PA, Towson, MD, for Defendants.

## MEMORANDUM

MOTZ, District Judge.

Imre Bessenyei has sued a number of medical care providers, including Brent C. Birely, M.D., for medical malpractice after receiving allegedly negligent emergency care at Fallston General Hospital. Dr. Salvatore Raiti, the emergency room physician who treated Bessenyei, telephoned and consulted with Dr. Birely before releasing Bessenyei. Birely now moves for summary judgment. For the reasons set forth below, summary judgment will be granted to Birely.

### I.

On Friday, August 7, 1998, Bessenyei injured his left thumb when paint thinner was injected into the pulp of his finger. (Pl.'s Opp'n at 1.) He reported to Fallston General Hospital Emergency Department for medical care. (*Id.*) After in-take at the emergency room, plaintiff's injured thumb was placed in a betadine soak. (Raiti Dep., Def.'s Mem., Ex. C, at 20.) Plaintiff was then examined by Dr. Salvatore Raiti who, according to Raiti, told plaintiff he should report to the hand clinic at Union Memorial Hospital where the doctors were better qualified to treat the injury. (*Id.* at 19–20.) Raiti claims plaintiff refused to go to Union Memorial and wanted instead to return to his home in Virginia. (*Id.* at 24.) Plaintiff, however, maintains he was never told it was necessary to go to Union Memorial. (Bessenyei Dep., Pl.'s Opp'n, Ex. C, at 24.)

At some point, and it is unclear exactly when,[1] Dr. Raiti telephoned Dr. Birely to receive consultation on treating the injured thumb.[2] (Raiti Dep., Pl.'s Opp'n, Ex. A, at 22.) In 1998, Dr. Birely was on staff at Fallston General, but he was not an on-call doctor the evening of plaintiff's injury. (Birely Dep., Pl.'s Opp'n, Ex. H, at 8; Def.'s Mem., Ex. B, at 11.) Dr. Raiti called Birely because, according to Raiti, when somebody was needed "he [Dr. Birely] would be the one who would come.... [H]e was one that was very willing to help." (Raiti Dep., Pl.'s Opp'n, Ex. A, at 23.) Raiti described the injury to Birely. According to Raiti, Birely told Raiti to give the man antibiotics and pain medicine and that he (Dr. Birely) could follow up with the patient on Monday. (Id., Ex. I, at 26.) Birely did not charge for the consultation. Dr. Raiti does not remember whether he gave plaintiff antibiotics before or after speaking with Dr. Birely, but is sure he told plaintiff of the advice he received from the surgeon he called (though he did not make an appointment for plaintiff with Dr. Birely or give plaintiff Birely's phone number). (See Raiti Dep., Pl.'s Opp'n, Ex. I, at 26–27; Def.'s Mem., Ex. C, at 42–43.)

Bessenyei was discharged with instructions to follow up with his doctor and to report to the Hand Center at Union General if his condition deteriorated. (Def.'s Mem., Ex. A, at 8.) He returned home that night and sought emergency medical attention for his injury again on Saturday.

(Def.'s Mem. at 4.) Eventually, the tip of plaintiff's thumb was amputated as a result of the injury. (Id.) Plaintiff alleges the amputation and significant impairment to his left thumb and hand directly resulted from defendants' negligence in treating him on the day of the accident. Bessenyei claims the doctors should have recognized the seriousness of his high pressure injection wound and performed or recommended a debridement, decompression, and irrigation on that evening.

## II.

Dr. Birely moves for summary judgment on three separate grounds. Birely claims that: (1) a physician-patient relationship was never established between himself and plaintiff; (2) plaintiff has failed to produce any evidence that Birely's actions caused plaintiff's legal injury; and (3) Maryland's Good Samaritan Act provides Dr. Birely with immunity.[3]

In order to state a claim for negligence under Maryland law, plaintiff must prove "(1) that the defendant was under a duty to protect plaintiff from the injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss and (4) that the loss or injury proximately resulted from the defendant's breach of duty." See Sterling v. Johns Hopkins Hospital, 145 Md.App. 161, 802 A.2d 440, 444 (2002) (quoting Rosenblatt v. Exxon, 335 Md. 58, 642 A.2d 180, 188

---

1. Dr. Raiti claims it was "an afterthought" when he realized the plaintiff was going to return home without getting further treatment at Union Memorial. (Raiti Dep., Def.'s Mem., Ex. C, at 38.) According to the Emergency Registration Form Nursing Assessment timeline, the patient was interviewed by Dr. Raiti at 7:25 p.m. and pain medication was given at 7:30 p.m. By 8:00 p.m., Dr. Raiti had spoken with Dr. Birely and "[n]o intervention was ordered at this time." Plaintiff was again medicated at 8:50 p.m., given a tetanus shot

at 9:10 p.m., and subsequently released. (See Def.'s Mem, Ex. A, at 7.)

2. At the time, Dr. Raiti believed Dr. Birely to be a hand surgeon, though he is in fact a plastic surgeon.

3. Because I hold that no physician-patient relationship existed between Birely and Bessenyei, it is unnecessary to address Birely's second and third arguments.

(1994)). "The duty of care owed to an individual in the medical context is based primarily on the existence of the physician-patient relationship." *Id.* at 445. "Maryland has recognized that the existence of a duty constitutes a legal determination" made by the court. *Id.* Plaintiff has failed to establish the existence of a relationship giving rise to a duty owed to him by Dr. Birely.

In making their respective arguments regarding the physician-patient relationship, both parties rely upon *Sterling v. Johns Hopkins Hospital,* 145 Md.App. 161, 802 A.2d 440 (2002). In *Sterling,* a pregnant woman, Laverne Sterling, entered the Peninsular Regional Medical Center ("PRMC") exhibiting various symptoms indicating her pregnancy was in danger. *Id.* at 442. The next day, with her condition worsening, Sterling came under the care of Dr. Gray, who ordered labwork and rendered a presumptive diagnosis of severe pre-eclampsia and potential HELLP syndrome. *Id.* When this diagnosis was confirmed, Dr. Gray initiated the process of transferring Sterling to another hospital because PRMC did not have a neonatal intensive care unit and her condition potentially required the premature delivery of her child. *Id.*

Dr. Gray spoke with the attending physician at Johns Hopkins, Dr. Adib Khouzami. Dr. Gray informed Dr. Khouzami of the patient's diagnosis and her lab results. *Id.* at 443. After agreeing with Gray's diagnosis, Khouzami asserted that Hopkins had the resources available to care for the patient and would accept the patient. *Id.* The doctors further agreed Sterling would be transported by ambulance per regional guidelines, even though Dr. Gray had initially requested transport via helicopter. *Id.* During her trip to Johns Hopkins, Sterling became unresponsive. The ambulance was diverted to Memorial Hos-

pital in Easton, Maryland where a caesarean section was performed. *Id.* In the process, Sterling suffered an intraventricular hemorrhage that resulted in her death two days later. *Id.*

The *Sterling* court held that a physician-patient relationship was never established between Dr. Khouzami and Sterling, and therefore, neither Khouzami or Johns Hopkins could be held liable in negligence. *Id.* at 458. While recognizing that the creation of a physician-patient relationship was not predicated upon the existence of an express contract or direct contact between the parties, the court nonetheless determined that Dr. Khouzami had not implied his consent to enter into a physician-patient relationship with Sterling even though he had accepted the request to transfer her to Hopkins. *Id.* at 446, 458. The court stated:

> Dr. Khouzami owed no independent consultive duty to PRMC, its staff or patients with respect to the care and treatment of individual patients.... [W]hile Dr. Khouzami did conclude that the diagnosis and treatment given to Ms. Sterling at PRMC was appropriate, he did not give any advice that would cause Dr. Gray or the staff at PRMC to rely on his expertise. Dr. Khouzami, in essence, merely conveyed the fact that Johns Hopkins had the facilities and staff to treat that appellant if she was transferred.

*Id.* at 458.

The analysis in which the *Sterling* court engaged to reach its determination loosely focuses on three areas: (1) the existence of a relationship between the consulting doctor and the facility providing care that would require the consulting doctor to provide advice; (2) the degree to which the consultation given affected the course of treatment; and (3) the relative ability and independence of the immediate care pro-

vider to implement his or her own decision. Like the doctor in *Sterling*, Dr. Birely did not imply his consent to enter into a physician-patient relationship when he confirmed Dr. Raiti's diagnosis, agreed that antibiotics and pain medication were appropriate, and conveyed the fact he would see the patient on Monday of the following week. *See id.* at 458. (*See* Raiti Dep., Pl.'s Opp'n, Ex. I, at 26.)

Dr. Birely owed no independent consultive duty to Fallston General or the plaintiff as a patient of the hospital. While Dr. Birely had privileges at the hospital where plaintiff was seen, his on-staff status does not give him a duty to every patient admitted there. Birely was the doctor Raiti called for advice in this situation, but that does not make him the on-call doctor or create the duty that might be found were he the on-call doctor. *See Thomas v. Corso*, 265 Md. 84, 288 A.2d 379, 390 (1972) (holding a physician-patient relationship could be established where the "on-call" doctor was the only physician available and directed the activities of a nurse); *see also Lownsbury v. VanBuren*, 94 Ohio St.3d 231, 762 N.E.2d 354, 360 (2002) (noting that the doctor's consent to enter into the physician-patient relationship may take the form of a physician's agreement with the institution to handle patients) (cited in *Sterling*, 802 A.2d at 448–49).

Dr. Raiti is equivocal about the degree to which he relied upon the advice of Dr. Birely. In most respects, it appears Raiti had already diagnosed the patient and decided on a course of action. Raiti characterizes the call to Birely as "an afterthought" because Raiti was concerned the plaintiff was not going to seek the specialized treatment required.[4] (*See* Raiti's Dep., Def.'s Mem., Ex. C, at 33, 38.) Raiti goes on to say, "I felt reassured when I talked to Dr. Birely that I needed to act the way that I was thinking"—indicating he had already decided upon a course of action. (*See* Pl.'s Opp'n, Ex. I, at 28.) On the other hand, Raiti was asked the question, "was it your belief at the time that you discharged this fellow [Bessenyei] that Dr. Birely's advice took precedence over your initial belief that this fellow should go right to Union Memorial?" Dr. Raiti responded, "That was my belief, yes." (*Id.*, Ex. B, at 33–34.) This isolated statement, however, does not resolve the issue. It does not explain how Birely's advice could "take precedence" over Raiti's initial thinking if Raiti was, at the same time, reassured he should "act the way [he] was thinking."[5] (*See id.* at 34–35.) Viewing the totality of Raiti's statements regarding his conversation with Birely in the light most favorable to plaintiff, one cannot say that Raiti was relying upon Birely's expert advice in prescribing a course of treatment for Bessenyei.[6]

**4.** Raiti also said, "Well, I felt this man probably needed some help and I said, 'Well, maybe I can get Dr. Birely to come here and see him.' That was my thought process when I called Dr. Birely." (*Id.*, Ex. I, at 25.)

**5.** Raiti also has a limited recollection of the particulars of the conversation. For his part, Dr. Birely candidly admits he has no recollection of the phone call. When asked what he would do were he called regarding a high pressure injection injury, Birely asserts he would say that was something he "was not familiar with how to take care of." (Birely Dep., Def.'s Mem., Ex. B, at 13.) When asked

if he would recommend antibiotics and pain medication if faced with such a situation, Birely says that would have been part of his recommendation, but that he also would recommend the patient be evaluated and seen at Union Memorial Hospital. (*Id.* at 31–32.)

**6.** Moreover, there is no indication in the record that Raiti made it clear to Birely that Raiti was relying upon Birely's "expert advice" as a hand surgeon (Birely is a plastic surgeon, not a hand surgeon). In arguing against this, plaintiff places too much weight on Birely's statement in deposition that Raiti would "most likely take the information I

In the end, it was Dr. Raiti who had decision-making authority over plaintiff's course of treatment. The conversation that took place, whatever its precise contents, was a conversation between two doctors of comparable ability and competence to handle the situation. (*See* Birely Dep., Def.'s Mem., Ex. B, at 13.) Like Dr. Gray in *Sterling,* it was Dr. Raiti who had direct contact with the patient, who rendered the initial diagnosis in the case, and who initiated contact with another healthcare professional. *Cf. Sterling,* 802 A.2d at 457–58. Dr. Raiti was the doctor looking at the patient and he could override Dr. Birely by deciding to accept or reject his recommendations. *Cf. id.* While not admitted at deposition as it was by the doctor in *Sterling,* it is clear that Dr. Raiti had the final say in the decision to release plaintiff with the instructions he was given. Birely should, therefore, not be regarded as a joint provider of medical services. *See Gilinsky v. Indelicato,* 894 F.Supp. 86, 92 (E.D.N.Y.1995) ("Where ... the treating physician exercises his or her own independent judgment in determining whether to accept or reject [a consultant's] advice, ... the consultative physician should not be regarded as a joint provider of medical services with respect to the patient.") (quoted in *Sterling,* 802 A.2d at 455).

Raiti's deposition testimony regarding his conversation with Birely, viewed in the light most favorable to plaintiff, does not provide the basis to find a physician-patient relationship was established between Birely and Bessenyei. Likewise, the brief note written by Dr. Raiti indicating he had spoken with Dr. Birely is insufficient to establish such a relationship. (*See* Def.'s

Mem., Ex. A, at 3.) Dr. Birely does not recall the conversation at all. Plaintiff has failed to create a genuine issue of material fact as to whether a physician-patient relationship existed between himself and Dr. Birely. As a matter of law, no such relationship existed.

A separate order is being entered herewith.

### ORDER

For the reasons stated in the accompanying memorandum, it is, this 9th day of June 2003,

ORDERED that

1. Defendant Brent C. Birely's motion for summary judgment is hereby granted; and

2. Judgment is entered in favor of Dr. Birely against plaintiff.

gave him and then utilize it to make his decisions." (Birely Dep., Pl.'s Opp'n, Ex. K, at 27.) It only stands to reason that Birely's thoughts on the matter would be a factor in Raiti's subsequent decision—otherwise Raiti would not have called him. But an implication that one will be considering another's opinion in the decision-making process and a declaration that one is relying upon the advice being given to control the course of treatment are two very different things.