*Scott Wadsworth, et al. v. Poornima Sharma, et al.*, No. 40, September Term, 2021. Opinion by Getty, C.J.

**WRONGFUL DEATH — LOSS OF CHANCE DOCTRINE — CAUSATION**

The Court of Appeals held that a party who brings a wrongful death action under Md. Code (1974, 2020 Repl. Vol.), Courts and Judicial Proceedings Article § 3-902(a) as the result of alleged medical malpractice bears the burden of proving that the alleged malpractice proximately caused the decedent's death.

Circuit Court for Baltimore County
Case No. 03-C-18-003707
Argued: February 8, 2022

IN THE COURT OF APPEALS

OF MARYLAND

No. 40

September Term, 2021

---

SCOTT WADSWORTH, ET AL.

v.

POORNIMA SHARMA, ET AL.

---

\*Getty, C.J.
\*McDonald,
Watts,
Hotten,
Booth,
Biran,
Harrell, Glenn T., Jr.,
   (Senior Judge, Specially Assigned)

JJ.

---

Opinion by Getty, C.J.

---

Filed: July 15, 2022

\*Getty, C.J., and McDonald, J., now Senior Judges, participated in the hearing and conference of this case while active members of this Court. After being recalled pursuant to Md. Const., Art. IV, § 3A, they also participated in the decision and adoption of this opinion.



Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.

Suzanne C. Johnson, Clerk

At common law, a personal action died with the person. Therefore, the moment a person passed away, any cause of action that person could maintain against another could no longer be brought. This common law rule left family members of decedents without recourse for injuries suffered during the decedent's lifetime. To remedy that consequence, state legislatures adopted their own version of a wrongful death statute, often modeled after the Lord Campbell's Act—England's statute modifying the common law rule. In pertinent part, Maryland's Wrongful Death Act, first enacted in 1852, provides that "[a]n action may be maintained against a person whose wrongful act causes the death of another." Md. Code (1974, 2020 Repl. Vol.), Courts and Judicial Proceedings Article ("CJ") § 3-902(a). Generally, spouses, parents, and children of the decedent may bring wrongful death claims. CJ § 3-904(a)(1).

In wrongful death claims, plaintiffs face the challenge to demonstrate that the defendant proximately caused the decedent's death. Therefore, in an attempt to balance perceived inequities that occur under traditional causation principles, some jurisdictions have adopted the loss of chance doctrine. In the medical malpractice context, the loss of chance doctrine allows the plaintiff to recover if the plaintiff can prove that the defendant's negligence caused the loss of chance of a better outcome, including survival. Other jurisdictions, including Maryland, have rejected the doctrine in favor of maintaining well-settled proximate causation principles, thus leaving to the state legislature the decision of whether to alter the proximate causation standard.

In this case, we revisit the loss of chance doctrine. Consistent with the plain language and legislative history of CJ § 3-902(a) and our prior decisions, we hold that the

Circuit Court for Baltimore County and the Court of Special Appeals correctly decided Mr. Wadsworth's wrongful death claim because he pleaded a loss of chance case, which is not recognized in Maryland. Accordingly, for the reasons explained below, we affirm the Court of Special Appeals.

## BACKGROUND

In 2006, doctors diagnosed Stephanie Wadsworth with Stage IIIC[1] breast cancer in her left breast. Treatment for Ms. Wadsworth's diagnosis included a left mastectomy, chemotherapy, and radiation therapy. Following these treatments, Ms. Wadsworth underwent a series of follow-up PET/CT scans on August 22, 2006, July 18, 2007, and August 28, 2008. Each scan was negative for metastatic disease.

Over four years later, Ms. Wadsworth underwent a new round of diagnostic testing ordered on March 15, 2013 by her oncologist, Poornima Sharma, M.D. This round of

---

[1] Breast cancer staging allows medical professionals to "communicate how far the disease has progressed." National Breast Cancer Foundation, *Stages*, https://www.nationalbreastcancer.org/breast-cancer-staging/ [https://perma.cc/7XB5-KL67]. Breast cancer is identified as Stage III when the "the breast cancer has extended to beyond the immediate region of the tumor and may have invaded nearby lymph nodes and muscles, but has not spread to distant organs." National Breast Cancer Foundation, Inc., *Stage 3 (III) A, B, and C Breast Cancer Overview*, https://www.nationalbreastcancer.org/breast-cancer-stage-3 [https://perma.cc/V53J-DZ69]. Stage III breast cancer is separated into three groups: Stage IIIA, Stage IIIB, and Stage IIIC. *Id.* Designation as Stage IIIA, B, or C depends on the "size of the tumor and whether cancer has spread to the lymph nodes and surrounding tissue." *Id.* Stage IIIC breast cancer includes any of the following three descriptions: (1) "[n]o tumor or a tumor of any size [and] [c]ancer has spread to 10+ lymph nodes"; (2) "[n]o tumor or a tumor of any size [and] [c]ancer has spread to lymph nodes near collar bone;" or (3) "[n]o tumor or a tumor of any size [and] [c]ancer has spread to lymph nodes near underarm or breastbone[.]" *Id.*

2

testing included laboratory studies, a mammogram, and a PET/CT scan. Ms. Wadsworth produced an abnormal PET/CT scan on April 1, 2013, depicting a new and potentially cancerous lesion on her clavicle. Dr. Sharma reviewed the scan but did not report the results to Ms. Wadsworth or conduct further testing.[2]

Three years after her abnormal scan, Ms. Wadsworth fell and injured her right shoulder. Ms. Wadsworth went to the hospital for her shoulder injury, and a bone scan depicted a malignant bone lesion on her right clavicle. On March 8, 2016, Ms. Wadsworth underwent an open biopsy, which showed that the lesion was "metastatic adenocarcinoma compatible with a breast primary"—i.e., Ms. Wadsworth's left breast cancer metastasized to her clavicle.

Ms. Wadsworth continued treatment but passed away on June 10, 2017. Ms. Wadsworth's survivors were her husband, Scott Wadsworth, their children, Elizabeth and Matthew Wadsworth, and her father, Joseph Eline, Jr. Her husband, Mr. Wadsworth, filed a survival action and wrongful death action in the Circuit Court for Baltimore County against Dr. Sharma, University of Maryland Oncology Associates, P.A. ("UMOA"),

---

[2] Laurence D. Goldstein, M.D. also interpreted the scan and concluded that Ms. Wadsworth experienced arthritic change. At the motion for summary judgment hearing, Dr. Sharma's attorney argued that "Dr. Sharma . . . met with another radiologist . . . and decided . . . not to do anything at that point because the radiologist did not . . . think this was metastatic breast cancer" but recommended Ms. Wadsworth "come back in [four] months for a follow-up." The complaint also clarifies that Dr. Sharma "or someone from her office, received and reviewed the abnormal April 1, 2013, PET/CT imaging results[.]"

3

University of Maryland Community Medical Group, Inc. ("UMCMG"), and others.[3]  Ms. Wadsworth's father and children joined the wrongful death action.

Dr. Sharma, UMOA, and UMCMG filed a motion for summary judgment arguing that the loss of chance doctrine, the legal theory upon which Mr. Wadsworth's lawsuit is based, is not recognized in Maryland.  On October 7, 2019, the circuit court held a hearing regarding the motion for summary judgment, as well as other motions not pertinent to this appeal.  Depositions from Dr. James J. Stark and Dr. Andrew M. Schneider were referenced at the hearing.  Dr. Schneider stated that "there is no cure once you have metastasis" and that "the average person like [Ms. Wadsworth] would have lived . . . an additional [eighty] months" from the date of the abnormal scan.  Dr. Stark did not offer an opinion on whether treating Ms. Wadsworth sooner would have cured her breast cancer.  In response to a question of whether metastatic breast cancer is a "death sentence[,]" Dr. Stark answered, "[y]es.  I mean, no one today survives metastatic breast cancer, with the possible exception of oligometastatic disease[.][4]"

---

[3] Mr. Wadsworth also sued Dr. Goldstein and Advanced Radiology, P.A.  The record suggests that Advanced Radiology, P.A. was voluntarily dismissed without prejudice, but the record is unclear regarding how Dr. Goldstein is no longer a party to the lawsuit.  In proceedings before the Circuit Court for Baltimore County, UMCMG, in addition to joining Dr. Sharma and UMOA's motion for summary judgment, filed a separate motion for summary judgment.  In UMCMG's independent motion for summary judgment, UMCMG argued that it did not employ Dr. Sharma on April 1, 2013.  Mr. Wadsworth did not oppose UMCMG's motion for summary judgment, and the circuit court granted the motion at the hearing on October 7, 2019.

[4] Oligometastatic breast cancer is a "more treatable type of 'limited' metastatic cancer" where the "cancer has only spread to either one or a few sites in [the] body."  UChicago Medicine, *Understanding Metastatic Cancer and Oligometastatic Cancer*, https://www.uchicagomedicine.org/cancer/types-treatments/limited-metastatic-cancer-

Relying on depositions from Dr. Stark and Dr. Schneider explaining the severity of metastatic breast cancer, the circuit court identified that, "[i]t is without dispute that the proximate cause and the actual, sole cause of [Ms. Wadsworth's] death was the metastatic . . . breast cancer." Without evidence disputing that Ms. Wadsworth's metastatic breast cancer caused her death, the circuit court granted the motion for summary judgment, finding that "this is really a loss of chance cause of action, which does not exist in . . . Maryland."

Mr. Wadsworth appealed the grant of summary judgment to the Court of Special Appeals. The Court of Special Appeals held that Mr. Wadsworth could not show that Dr. Sharma's conduct caused Ms. Wadsworth's death because the evidence presented to the circuit court did not show that Ms. Wadsworth's likelihood of survival was greater than fifty percent absent Dr. Sharma's alleged negligence—i.e., Mr. Wadsworth could not meet his burden of proving that Dr. Sharma's alleged negligence more likely than not caused Ms. Wadsworth's death. The intermediate appellate court held that, "[t]he motions [court] had no choice but to grant summary judgment in favor of the defendants . . . as to the wrongful death claim." *Wadsworth v. Sharma*, 251 Md. App. 159, 183 (2021).

Mr. Wadsworth petitioned for a writ of *certiorari*, which we granted on October 12, 2021. *Wadsworth v. Sharma*, 476 Md. 264 (2021). Mr. Wadsworth's petition for writ of *certiorari* requested that we answer whether "Maryland's Wrongful Death Statute,

program/understanding-metastatic-cancer-and-oligometastatic-cancer [https://perma.cc/BPH2-MC7R]. The record does not suggest that Ms. Wadsworth's metastatic breast cancer fit into the "possible exception of oligometastatic disease."

specifically, § 3-902(a) of the Courts and Judicial Proceedings Article, permit[s] wrongful death beneficiaries to recover from a health care provider where the actions of the health care provider shortened the terminally ill decedent's life?"  In essence, the question presented invites this Court to review its decisions in *Weimer v. Hetrick* and *Fennell v. Southern Maryland Hospital Center, Inc.*—two cases setting Maryland's foundation for the loss of chance doctrine in wrongful death and survival claims.  Precisely, we consider whether the loss of chance doctrine applies to Mr. Wadsworth's wrongful death claim.

## STANDARD OF REVIEW

Granting a motion for summary judgment is proper when "the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law."  Md. Rule 2-501(f).  Whether a trial court properly granted a motion for summary judgment is subject to *de novo* review.  *Chateau Foghorn LP v. Hosford*, 455 Md. 462, 482 (2017) (citations omitted).  In reviewing a grant of summary judgment, we independently review the record in the light most favorable to the nonmoving party and construe reasonable inferences against the moving party.  *Id.*

## DISCUSSION

### A.    *Parties' Contentions*

CJ § 3-902(a) states that "[a]n action may be maintained against a person whose wrongful act causes the death of another."  Mr. Wadsworth encourages this Court to strictly adhere to the plain language of CJ § 3-902(a), particularly with respect to the use of the word "causes[.]"  Mr. Wadsworth cites to the Oxford English Dictionary's definition of

6

"cause" that states, "that which produces an effect; that which gives rise to an action, phenomenon, or condition."

Mr. Wadsworth argues that Dr. Sharma's decision to not follow up with Ms. Wadsworth after her abnormal scan "g[ave] rise to" Ms. Wadsworth's June 10, 2017 death. According to Mr. Wadsworth, had Dr. Sharma started treating Ms. Wadsworth immediately after she produced the abnormal scan, she would have lived an additional two and a half years. Mr. Wadsworth acknowledges that Maryland jurisprudence has clarified "cause" as it relates to negligence but contends that he needed to prove that Ms. Wadsworth "would not have died on June 10, 2017 but for [Dr. Sharma's] negligent failure to inform her of the abnormal PET/CT scan results, and thereafter, to order timely and appropriate follow-up testing and life-prolonging treatment and care."

Mr. Wadsworth also argues that this Court's prior decision concerning loss of chance in *Weimer v. Hetrick* is inapplicable. 309 Md. 536 (1987). He asserts that the loss of chance doctrine does not apply because he seeks to recover for a concrete time— approximately two and a half years—not for Ms. Wadsworth's natural life expectancy.

Dr. Sharma argues that Mr. Wadsworth fails to accurately address our decision in *Weimer*, which directly resolves the wrongful death claim. Dr. Sharma notes that the parties agree that Ms. Wadsworth's survival rate was less than fifty percent once her breast cancer metastasized. Because Ms. Wadsworth's survival rate did not exceed fifty percent absent Dr. Sharma's alleged negligence, Mr. Wadsworth could not prove that Dr. Sharma's alleged negligence proximately caused Ms. Wadsworth's death. Dr. Sharma states that Mr. Wadsworth's argument that *Weimer* is inapplicable is a collateral attack on our prior loss

7

of chance decisions, especially considering Mr. Wadsworth's position in the prior proceedings in the circuit court and Court of Special Appeals. In the Court of Special Appeals, Mr. Wadsworth directly argued that Maryland should adopt loss of chance recovery in wrongful death claims. Further, Dr. Sharma maintains that any changes to the Wrongful Death Act in Maryland are best resolved by legislation in the General Assembly.

For the following reasons, we hold that Mr. Wadsworth's wrongful death claim against Dr. Sharma is a loss of chance case, which is not recognized in Maryland. Therefore, we affirm the Court of Special Appeals regarding Mr. Wadsworth's wrongful death claim.

## B.      *Courts and Judicial Proceedings Article § 3-902(a)*

*1.      The History of the Wrongful Death Act*

In 1852, the General Assembly enacted the Maryland Wrongful Death Act to abrogate the common law principle that a personal action died with the person. *Parker v. Hamilton*, 453 Md. 127, 134 (2017); *Stewart v. United Elec. Light & Power Co.*, 104 Md. 332, 333–34 (1906). At common law, "if an injury were done either to the person or property of another for which damages only could be recovered in satisfaction, the action died with the person to whom or by whom[] the wrong was done." *Stewart*, 104 Md. at 333–34 (emphasis omitted). Maryland's Wrongful Death Act is based on England's Fatal Accidents Act of 1846, which is also known as the Lord Campbell's Act. The Lord Campbell's Act provided that

> § 1. [W]hensoever the death of a person shall be caused by wrongful act, neglect, or default, and the act, neglect[,] or default is such as would (if death had not ensued), have entitled the party injured to maintain an action, and

8

recover damages in respect thereof, then, and in every such case, the person who would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances, as amount in law to felony.

§ 2. [E]very such action shall be for the benefit of the wife, husband, parent, and child of the person whose death shall have been so caused, and shall be brought by, and in the name of, the executive, or administrator, of the person deceased; and in every such action the jury may give such damages as they may think proportioned to the injury, resulting from such death, to the parties respectively for whom, and for whose benefit, such action shall be brought[;] and the amount so recovered, after deducting the costs not recovered from the defendant, shall be divided amongst the before mentioned parties, in such shares as the jury, by their verdict, shall find and direct.

Fatal Accidents Act 1846, 9 & 10 Vict. c. 93 (Eng.). Every state has a similar statute, often based upon the Lord Campbell's Act, remedying the common law rule. *Parker*, 453 Md. at 135.

As enacted in 1852, the Maryland Wrongful Death Act "strongly resembl[ed]" the Lord Campbell's Act. *Mummert v. Alizadeh*, 435 Md. 207, 215 (2013). In pertinent part, the 1852 enactment provided

[t]hat whensoever the death of a person shall be caused by wrongful act, neglect or default, and the act, neglect or default is such as would (if death had not ensued,) have entitled the party injured to maintain an action and recover damages in respect thereof, then and in every such case the person who would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to felony.

Md. Code (1879), Art. 67 § 1; 1852 Md. Laws, ch. 299.

9

The Wrongful Death Act remained "virtually unchanged" from its enactment until 1974. *Mummert*, 435 Md. at 215. In 1974, as part of Maryland's code revision,[5] the General Assembly repealed Article 67 and reenacted the Wrongful Death Act as Title 3, Subtitle 9 of the Courts and Judicial Proceedings Article. CJ § 3-902(a) provides that "[a]n action may be maintained against a person whose wrongful act causes the death of another." "The 197[4] changes to the statute were made for style and organization purposes, not to alter the meaning of the statute, as is the usual goal of [c]ode revision." *Mummert*, 435 Md. at 216 (citations omitted).

Other than code revision in 1974, the Wrongful Death Act has only been changed by three bills in which the General Assembly extended the time limitation to bring a wrongful death claim. 1950 Md. Laws, ch. 89; 1959 Md. Laws, ch. 751; 1971 Md. Laws, ch. 784; *see also Mummert*, 435 Md. at 216 (citing *Waddell v. Kirkpatrick*, *rev'd on other grounds*, 331 Md. 52, 56 n.4 (1993)) ("The original limitation in the 1852 enactment was twelve months, but it was extended later to eighteen months, then to two years, and eventually to three years to bring it 'in uniformity with that of other negligence actions.'").

---

[5] "As we have noted in the past, '[c]ode revision is a periodic process by which statutory law is re-organized and restated with the goal of making it more accessible and understandable to those who must abide by it.'" *United Bank v. Buckingham*, 472 Md. 407, 427 n.6 (2021) (quoting *Nationwide Mut. Ins. Co. v. Shilling*, 468 Md. 239, 251 n.9 (2020)). "Maryland [c]ode [r]evision began in 1970 as a long-term project to create a modern comprehensive code when Governor Marvin Mandel appointed the Commission to Revise the Annotated Code. This formal revision of the statutory law for the General Assembly was coordinated by the Department of Legislative Services. Code [r]evision was completed in 2016 with the enactment by the General Assembly of the Alcoholic Beverages Article." *Id.* (quoting *Nationwide Mut. Ins. Co.*, 468 Md. at 251 n.9).

*2.    Statutory Interpretation*

Statutes in derogation of the common law, including Maryland's Wrongful Death Act, must be strictly construed. *Weimer*, 309 Md. at 554; *McKeon v. State, Use of Conrad*, 211 Md. 437, 443 (1956). This Court's "chief objective is to ascertain the General Assembly's purpose and intent when it enacted the statute." *Moore v. RealPage Util. Mgmt., Inc.*, 476 Md. 501, 510 (2021) (quoting *Berry v. Queen*, 469 Md. 674, 687 (2020)). It is well settled that "[w]e assume that the legislature's intent is expressed in the statutory language and thus our statutory interpretation focuses primarily on the language of the statute to determine the purpose and intent of the General Assembly." *Id.* (citations omitted).

When interpreting statutes, we first look to the "plain meaning of the language of the statute, reading the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Moore*, 476 Md. at 510 (quoting *Berry*, 469 Md. at 687). Further, we aim to avoid constructions that are illogical, unreasonable, or inconsistent with common sense. *United Bank v. Buckingham*, 472 Md. 407, 424 (2021).

Applying these principles, we turn to the language of CJ § 3-902(a). Section 3-902(a) states that "[a]n action may be maintained against a person whose wrongful act causes the death of another." We previously determined that the language of CJ § 3-902(a) is unambiguous, leaving no room for judicial interpretation. *Weimer*, 309 Md. at 554. Prior caselaw expanding upon the legal meaning of causation provides necessary context to our reading of CJ § 3-902(a).

11

Mr. Wadsworth erroneously relies on the common understanding of "causes" despite this Court's prior decisions elaborating on the legal meaning of cause. Consistently, we have recognized the requirement that plaintiffs prove by a preponderance of the evidence that the defendant directly and proximately caused the plaintiff's injury. *See Henley v. Prince George's Cty.*, 305 Md. 320, 333 (1986); *Peterson v. Underwood*, 258 Md. 9, 17 (1970). To satisfy proximate cause, the wrongful act or omission must be "(1) a cause in fact, and (2) a legally cognizable cause" of the injury. *Pittway Corp. v. Collins*, 409 Md. 218, 243 (2009) (citing *Hartford Ins. Co. v. Manor Inn*, 335 Md. 135, 156 (1994)). We require a legally cognizable cause because we acknowledge that there is often more than one cause to any effect. Therefore, proximate causation ensures that a defendant is not liable when the plaintiff's evidence provides "two or more equally likely causes of the injury, for only one of which [the] defendant is responsible." *Peterson*, 258 Md. at 17.

As illustrated fully below, we have consistently decided to keep traditional causation principles intact in wrongful death and survival claims. *See Weimer*, 309 Md. at 554; *Fennell v. S. Md. Hosp. Ctr., Inc.*, 320 Md. 776, 794 (1990). Therefore, reading CJ § 3-902(a) consistently with the legal meaning of cause, it is clear that the plaintiff bears the burden of proving by a preponderance of the evidence that the alleged wrongful act or omission proximately caused the decedent's death.

After reviewing the plain language of the statute, it is "the modern tendency of this Court . . . to continue the analysis of the statute beyond the plain meaning" of the statutory language and look to the legislative history. *In re: S.K.*, 466 Md. 31, 50 (2019). Reviewing

the legislative history serves as a confirmatory process to ensure that "our plain language interpretation of the statute is consistent with the legislature's intent." *Moore*, 476 Md. at 514 (citing *In re: S.K.*, 466 Md. at 50).

On three occasions, the General Assembly lengthened the time frame in which a party could bring a wrongful death claim. Initially, the statute provided that any wrongful death action must "be commenced within twelve calendar months after the death of the deceased person." 1852 Md. Laws, ch. 299. In 1950, the General Assembly lengthened the time frame from twelve months to eighteen months. 1950 Md. Laws, ch. 89. Then, in 1959, the General Assembly extended the eighteen-month time frame to two years. 1959 Md. Laws, ch. 751. Finally, in 1971, the General Assembly extended the time frame to bring a claim from two years to three years. 1971 Md. Laws, ch. 784.

Here, the lack of any recent legislation, aside from extending the time frame which plaintiffs can bring a claim, does not contradict our reading of CJ § 3-902(a). In 1987, this Court declined to judicially adopt the loss of chance doctrine in *Weimer v. Hetrick*. We have also reaffirmed our view that the loss of chance doctrine is not recognized in Maryland. *See Marcantonio v. Moen*, 406 Md. 395, 416 (2008); *Fennell*, 320 Md. at 794.

We presume that the General Assembly is "aware of this Court's interpretation of its enactments and, if such interpretation is not legislatively overturned, to have acquiesced in that interpretation." *Williams v. State*, 292 Md. 201, 210 (1981); *see also Bellard v. State*, 452 Md. 467, 494 (2017). In thirty-five years, the General Assembly has not passed legislation modifying our decision to reject the loss of chance doctrine. This inaction supports a conclusion that the General Assembly has acquiesced to our holdings in *Weimer*

13

and the subsequent decisions that reaffirmed *Weimer*. *See Howling v. State*, 478 Md. 472, 504 (2022) ("By declining to add a requirement of knowledge of prohibited status over the course of several decades, the General Assembly has acquiesced in Maryland appellate courts' interpretation of [the relevant statute]."); *Lawrence v. State*, 475 Md. 384, 422 (2021) (determining that "it is apparent that the General Assembly has acquiesced to our holding" in *Lee v. State*, 311 Md. 642 (1988), which interpreted statutory language that the General Assembly had not amended in the thirty-three years between *Lee* and *Lawrence*); *Stachowski v. State*, 416 Md. 276, 293–94 (2010) ("The General Assembly has acquiesced in this Court's interpretation of [the relevant statute] for thirty-five years since the *Jourdan* case was decided in 1975.").

It is this Court's practice to defer to the General Assembly decisions that "plainly involve[] major policy considerations." *Coleman v. Soccer Ass'n of Columbia*, 432 Md. 679, 690 (2013) (quoting *Harrison v. Montgomery Cty. Bd. of Educ.*, 295 Md. 442, 462 (1983)). The General Assembly is best equipped to identify, consider, and reconcile competing policy interests associated with the decision of whether to adopt the loss of chance doctrine. Therefore, any changes to the Wrongful Death Act are best suited to the legislative process in the General Assembly and not from this Court "in the guise of statutory construction." *Weimer*, 309 Md. at 554.

## C.    *This Court's Prior Decisions Regarding the Loss of Chance Doctrine*

The loss of chance doctrine permits recovery for the loss of chance resulting from a defendant's alleged wrongful or negligent conduct. In the context of medical malpractice, "the loss of chance doctrine permits a claimant to recover where a physician's breach of

14

the standard of care . . . caused the loss of a statistical chance of survival or of a better outcome." Tory A. Weigand, *Lost Chances, Felt Necessities, and the Tale of Two Cities*, 43 Suffolk U. L. Rev. 327, 349 (2010). Other loss of chance theories include recovery for "loss of chance of a positive or more desirable medical outcome, loss of chance of avoiding some physical injury or disease, or a loss of chance to survive." *Fennell*, 320 Md. at 781.

This Court has consistently rejected the loss of chance doctrine in deference to the General Assembly as the better forum to make policy determinations regarding the wrongful death statute. This Court's prior decisions in *Weimer v. Hetrick* and *Fennell v. Southern Maryland Hospital Center, Inc.* serve as the foundation of our review of loss of chance cases in Maryland.

*1.* Weimer v. Hetrick

In *Weimer v. Hetrick*, Jody Ann Hetrick and Michael Cary Hetrick brought a wrongful death action against the medical providers involved in delivering Jason Michael Hetrick, the Hetricks' deceased infant son. 309 Md. at 538–39. On September 2, 1978, Ms. Hetrick, who was pregnant at the time, arrived at Anne Arundel General Hospital and, at the service of Dr. Thomas R. Moeser, received a diagnosis of "severe gastroenteritis versus cholecystitis." *Id.* at 539. Ms. Hetrick's condition worsened, and on September 9, 1978, she underwent an exploratory laparotomy. *Id.* The exploratory laparotomy showed that Ms. Hetrick's gallbladder appeared normal. *Id.* However, she displayed a "great deal" of edema of the liver, leading her medical providers to believe she was "very early severe pre-eclamptic." *Id.* Without performing a cholecystectomy, doctors closed Ms. Hetrick's incision. *Id.*

15

Within twelve hours, Ms. Hetrick's medical providers determined that they could not control her severe pre-eclampsia and determined that Ms. Hetrick's pregnancy could not continue. *Weimer*, 309 Md. at 539. Ms. Hetrick agreed to deliver her baby via caesarean section with knowledge that a 32-week gestation infant may have a poor chance of survival. *Id.* Dr. Moeser and Dr. John S. Harris delivered the baby, who weighed three pounds, six ounces. *Id.* Dr. Stanley R. Weimer did not participate in the delivery but attempted to resuscitate the baby in the operating room after the delivery. *Id.* Dr. Weimer did not succeed in resuscitation efforts, and the baby died. *Id.*

In August 1982, the Hetricks filed a malpractice claim, pursuant to the Health Care Malpractice Claims Act with the Health Claims Arbitration Office. *Weimer*, 309 Md. at 538. They alleged that Dr. Weimer, Dr. Moeser, Dr. Harris, St. Agnes Hospital, and Anne Arundel General Hospital were negligent in their son's treatment. *Id.* A hearing occurred before an arbitration panel, and the panel found no liability on behalf of the healthcare providers. However, although Dr. Moeser settled the claims against him prior to the hearing, the arbitration panel found liability on his behalf. *Id.* at 539.

The Hetricks rejected the arbitration decision and filed suit against Dr. Weimer, Dr. Harris, and Anne Arundel General Hospital in the Circuit Court for Anne Arundel County. *Weimer*, 309 Md. at 539. Dr. Harris settled with the Hetricks prior to trial. *Id.* The Hetricks moved forward with a trial against Anne Arundel General Hospital and Dr. Weimer. *Id.* After the Hetricks concluded presenting evidence, Anne Arundel General Hospital successfully moved for a directed verdict. *Id.* Trial for the survival claim and wrongful death claim against Dr. Weimer continued. *Id.*

16

Dr. Kenneth L. Harkavy, a physician and neonatologist, testified that Dr. Weimer's medical services did not comply with the required standard of care. *Weimer*, 309 Md. at 539. Dr. Harkavy concluded that the baby would have had an eighty to ninety percent likelihood of survival had Dr. Weimer performed adequate resuscitation. *Id.* at 540. An opposing expert, Dr. Judith Gieske, concluded that Dr. Weimer met the standard of care and did not cause the baby's death. *Id.* at 541. An autopsy showed that "it would seem most probable that a combination of eclampsia plus general anesthesia led to fetal anoxia and the pathologic changes observed." *Id.* at 540.

> The circuit court instructed the jury, in pertinent part, as follows:
>
> Now plaintiffs need only prove the most likely cause of the baby's death in addition to everything else that I've said. The plaintiffs are not required to negate or exclude every other possible cause. However, if there are two or more causes, either of which could have resulted in the baby's death, one of which for which the pediatrician is responsible, and the others for which he is not, then the plaintiffs have to prove by evidence more likely . . . than not that the acts for which the pediatrician is responsible in fact caused the baby's death. Now there I've used that phrase by evidence more likely . . . than not.
>
> Take the example in this case, and it is strictly an example, and I don't mean to infer that these are the facts. Again, I'm only doing this to clarify what I've just said. You have to decide what the facts are. But if you should find that Dr. Weimer was responsible for the lack of oxygen and that was 50% of the cause of the death and if you feel that the prematurity was 50% of the cause of death, then that's the standoff again. We got two causes of action. There are two possible causes of death that are both equal. If that's the case, the plaintiff hasn't done what the law requires[,] and you must find in favor of the doctor. The plaintiff has to show that the act for which the doctor is responsible for is better than 50%, 51%. That's better.

*Weimer*, 309 Md. at 542–43. Counsel for the Hetricks objected to the jury instruction and stated that the instructions "failed to give . . . the instruction on *Thomas v. Corso*[6] to the effect that all that the plaintiff[s] need to prove is that the actions of Dr. Weimer took away a substantial possibility that the baby would have survived with appropriate resuscitation." *Id.* at 543. Counsel for the Hetricks continued:

> I object to giving the instruction that [counsel for Dr. Weimer] asked for . . . and with your example where you said 50% prematurity, 50% lack of appropriate resuscitation, I don't think that that is the burden [that is] upon the plaintiff. I think all that the burden—all that the plaintiff need[ed to] prove is that [the] failure to properly resuscitate took away a substantial possibility that this child would have survived. So in this specific case, as in *Thomas v. Corso*, even though we have offered evidence as to probability, we need only prove substantial possibility which was less than 50%.

*Id.* Ultimately, the jury returned verdicts against Dr. Weimer for both claims. *Id.*

Dr. Weimer appealed the verdicts to the Court of Special Appeals, which held in part that the circuit court erroneously instructed the jury as to causation. *Hetrick v. Weimer*, 67 Md. App. 522, 541 (1986). Relying on *Hicks v. United States* and *Thomas v. Corso*, the Court of Special Appeals determined that the circuit court erroneously instructed the jury

---

[6] In *Thomas v. Corso*, a driver hit the decedent, who was standing on the side of the road clearing ice from his car. 265 Md. 84, 87 (1972). The decedent arrived at the emergency room around 11:10 p.m. *Id.* at 88. The doctor on call ordered that the decedent be admitted to the hospital, which occurred around 11:45 p.m. *Id.* The doctor did not visit the decedent until 2:30 a.m. when the resuscitative efforts failed, and the doctor pronounced the decedent dead. *Id.* at 90. The decedent's cause of death was "traumatic shock, fractured femur and pelvis." *Id.* at 92. In rejecting the doctor's argument that the decedent's estate failed to prove causation, this Court quoted the "substantial possibility of survival" language in *Hicks v. United States*, 368 F.2d 626 (4th Cir. 1966). *Id.* at 102. We concluded that the evidence presented was "sufficient to justify a jury finding of a substantial possibility of survival which was destroyed by the failure of [the doctor] to examine, diagnose and treat [the decedent] at any time after [the decedent] arrived at the Emergency Room[.]" *Id.*

on causation because the instructions "imposed an improper burden upon [the Hetricks]." *Id.* Specifically, the intermediate appellate court applied the language stating, "if there was any substantial possibility of survival and the defendant has destroyed it, [the defendant] is answerable." *Id.* at 540. The Court of Special Appeals held that the proper burden of proof required the Hetricks to show that Dr. Weimer's negligence "deprived the patient of a *substantial possibility of survival*." *Id.* at 543 (emphasis in original).

Dr. Weimer appealed the Court of Special Appeals' decision to this Court. Regarding the wrongful death causation instruction, this Court reversed the Court of Special Appeals' decision that the circuit court erroneously instructed the jury. *Weimer*, 309 Md. at 555. After summarizing well-settled proximate causation principles and determining that the holdings in *Hicks* and *Thomas* are not inconsistent with those principles, this Court "decline[d] to accept [the Hetricks'] suggestion that such careful and analytical jurists . . . intended . . . to alter, without discussion, the rule of law governing the burden of proof so anciently formed and so uniformly applied in wrongful death cases" under the Maryland Wrongful Death Act. *Id.* at 552. Therefore, this Court determined that the plaintiff in a wrongful death case bears the burden to prove "by a preponderance of the evidence that the conduct of a defendant was negligent and that such negligence was a proximate cause" of the decedent's death. *Id.* at 554.

2.  Fennell v. Southern Maryland Hospital Center, Inc.

Although *Weimer* did not directly address whether the loss of chance doctrine is recognized in survival actions, this Court considered that specific issue a few years later in *Fennell v. Southern Maryland Hospital Center, Inc.*, 320 Md. 776 (1990). In *Fennell*, the

19

decedent, Cora Fennell went to the Emergency Room at Southern Maryland Hospital Center, Inc. ("SMHC") after waking up with a severe headache in the early morning of July 14, 1981. *Id.* at 778. Doctors feared Ms. Fennell was experiencing a neurosurgical emergency and ordered that Ms. Fennell receive a CT scan to view a possible intracranial bleed. *Id.* Records indicate that a CT scan was performed around 3:30 a.m. on July 14, 1981. *Id.* at 779. Dr. Ronald Uscinski admitted Ms. Fennell to SMHC at 4:00 a.m. and then to the Intensive Care Unit around 5:00 a.m. *Id.*

Ms. Fennell arrested at 7:40 a.m. She was then put on life support until the early morning of July 15, 1981 when she arrested for a second time and was pronounced dead. *Fennell*, 320 Md. at 779. Records show that no doctors from SMHC, including Dr. Uscinski, visited Ms. Fennell between 4:00 a.m. and 7:40 a.m. when she arrested for the first time. *Id.* The CT scan ruled out intracranial bleed but suggested signs of inflammation. *Id.* Ms. Fennell's autopsy later revealed that she suffered from meningitis, a symptom of which is swelling of the brain, requiring immediate and aggressive treatment. *Id.* at 779–80.

Ms. Fennell's family members, including her spouse and children, filed a medical malpractice claim, survival action, and wrongful death action against SMHC. *Fennell*, 320 Md. at 778. SMHC filed a motion for summary judgment. *Id.* The Fennells filed an affidavit from Dr. Michael C. Bach in their opposition to the motion for summary judgment. *Id.* at 779. The affidavit from Dr. Bach stated that proper medical treatment required a lumbar puncture within thirty minutes of the CT scan showing signs of

20

inflammation. *Id.* at 780. Dr. Bach estimated that Ms. Fennell would have had a forty percent chance of survival if her doctors exercised the appropriate standard of care. *Id.*

As the Health Claims Arbitration Board reviewed the Fennells' claims, this Court decided *Weimer*. *Fennell*, 320 Md. at 780. SMHC's motion for summary judgment cited Dr. Bach's affidavit stating that Ms. Fennell would have had a forty percent chance of survival, and both the Health Claims Arbitration Board and the Circuit Court for Prince George's County granted the motion on both the wrongful death and survival claims. *Id.* On appeal, Ms. Fennell's family members filed a bypass petition of *certiorari* to this Court, which this Court granted to address whether the loss of chance doctrine applied in survival actions. *Id.* at 778, 780–81.

This Court ultimately held that, like in wrongful death actions, loss of chance recovery is not permitted in survival actions in Maryland. *Fennell*, 320 Md. at 794. We reasoned that the General Assembly is best equipped to address and weigh policy concerns (such as increased medical malpractice litigation and higher medical malpractice insurance costs) associated with extending a new tort or new category of damages. *Id.* at 793–94. Further, we noted practical difficulties with recognizing the loss of chance doctrine, including the risk of confusing factfinders. *Id.* at 791.

3.  *Dr. Sharma's Motion for Summary Judgment*

The Court of Special Appeals correctly affirmed the Circuit Court for Baltimore County because Mr. Wadsworth pleaded a loss of chance case, which is not recognized in Maryland. Under principles of *stare decisis*, we are bound by our decisions in *Weimer* and *Fennell*. *Stare decisis* is Latin meaning "to stand by things decided[.]" *Md. Small MS4*

21

*Coal. v. Md. Dep't of the Env't*, ___ Md. ___, ___ (2022), 2022 WL 1771709 at *13. This Court employs the doctrine of *stare decisis* to "encourage[] the consistent development of legal principles, public reliance on our judicial decisions, and the perceived integrity of the courts." *Lawrence*, 475 Md. at 415 (quoting *State v. Stachowski*, 440 Md. 504, 520 (2014)).

Although the doctrine is not absolute, *stare decisis* encourages courts to "reaffirm, follow, and apply . . . the published decisional holdings of our appellate courts[.]" *Lawrence*, 475 Md. at 415 (quoting *Stachowski*, 440 Md. at 520). Only in rare circumstances should this Court overrule its own precedent. We recognize two "extremely narrow" situations where it would be appropriate to do so. *Id.* (citations omitted). This Court may abandon the doctrine of *stare decisis* when the decision is "clearly wrong and contrary to established principles" or where there is "a showing that the precedent has been superseded by significant changes in the law or facts." *Wallace v. State*, 452 Md. 558, 582 (2017) (quoting *DRD Pool Serv., Inc. v. Freed*, 416 Md. 46, 64 (2010)).

Neither exception to the doctrine of *stare decisis* applies here. This Court's decisions in *Weimer* and *Fennell* are not "clearly wrong and contrary to established principles" nor has there been "a showing that the precedent has been superseded by significant changes in the law or facts." *Wallace*, 452 Md. at 582. In both *Weimer* and *Fennell*, this Court relied on sound principles of statutory interpretation, well-settled proximate causation requirements, and prior caselaw establishing the practice to defer policy decisions to the General Assembly. *See Lawrence*, 475 Md. at 416 (finding that the decision in *Lee* was not "clearly wrong" because this Court's decision in *Lee* "accords with this Court's fundamental rules of statutory construction"). This Court was not "clearly

22

wrong" in its reliance upon or application of these underlying principles that led to the decisions in *Weimer* and *Fennell*.

Additionally, this Court's decisions in *Weimer* and *Fennell* are predominately based upon maintaining traditional causation principles in wrongful death and survival actions and deferring policy decisions to the General Assembly. The proximate cause requirement in negligence actions and our practice to defer policy decisions to the General Assembly still remain, meaning that the rationale for this Court's decisions in *Weimer* and *Fennell* has not "been superseded by significant changes in the law or facts." *Wallace*, 452 Md. at 582. *See Pittway Corp.*, 409 Md. at 243 (citation omitted) ("Proximate cause 'involves a conclusion that someone will be held legally responsible for the consequences of an act or omission.'"); *Coleman*, 432 Md. at 690 (explaining that decisions "plainly involv[ing] major policy considerations" are "best left to the General Assembly"). We conclude that neither exception applies in this case.

Here, the undisputed facts demonstrate that Ms. Wadsworth's metastatic breast cancer caused her death. Depositions from Dr. Stark and Dr. Schneider revealed that once breast cancer metastasizes, "there is no cure" and "no one . . . survives metastatic breast cancer[.]" Neither party presented experts to opine that Ms. Wadsworth's likelihood of survival, absent Dr. Sharma's alleged negligence, exceeded fifty percent or that she would have survived if Dr. Sharma started treating her on the date that she produced the abnormal scan. According to the undisputed opinions from Dr. Stark and Dr. Schneider, Ms. Wadsworth did not have a greater than fifty percent chance of survival, absent Dr. Sharma's alleged negligence.

23

Without evidence to dispute that Ms. Wadsworth had a greater than fifty percent chance of survival, Mr. Wadsworth, as a matter of law, cannot meet his burden to prove by a preponderance of the evidence that Dr. Sharma's alleged negligence caused Ms. Wadsworth's death. Therefore, Dr. Sharma correctly asserts that our decisions in *Weimer* and *Fennell* control.

In comparing *Weimer* and *Fennell* to the case before us, it is clear that Mr. Wadsworth pleaded a loss of chance case, which is not recognized in Maryland under the Wrongful Death Act. In *Weimer* and *Fennell*, both decedents did not possess a greater than fifty percent chance of survival, absent the alleged negligence. In *Weimer*, Ms. Hetrick opted for an emergency caesarean section with knowledge that her premature infant had a poor chance of survival. 309 Md. at 539. Although one expert testified that the infant decedent could have survived with proper resuscitation efforts, the autopsy revealed that the infant's death resulted from "eclampsia plus general anesthesia [that] led to fetal anoxia." *Id.* at 540. Likewise, in *Fennell*, an expert testified that, even with immediate and appropriate treatment for meningitis, the decedent had a forty percent chance of survival. 320 Md. at 780. In both *Weimer* and *Fennell*, this Court disposed of the cases through the decision to maintain the preponderance of the evidence standard in wrongful death and survival claims.

In essence, the decedents in *Weimer* and *Fennell*, absent the alleged negligence, did not possess greater than a fifty percent chance of survival. Because the plaintiffs could not meet their burden to prove by a preponderance of the evidence that the alleged negligence caused the decedents' deaths, this Court held in favor of the defendants for claims premised

24

upon the loss of chance doctrine. Under the doctrine of *stare decisis*, we hold that Mr. Wadsworth's wrongful death claim cannot proceed because the loss of chance doctrine is not recognized in Maryland.

Therefore, the circuit court correctly determined that Mr. Wadsworth's case is a loss of chance case, which is not recognized in Maryland. Finding that "[i]t is without dispute that the proximate cause and the actual, sole cause of [Ms. Wadsworth's] death was the metastatic . . . breast cancer[,]" the circuit court correctly granted Dr. Sharma's motion for summary judgment because Mr. Wadsworth could not meet his burden of proof as a matter of law. Additionally, the Court of Special Appeals correctly affirmed the circuit court's decision relating to the wrongful death claim.

## CONCLUSION

For the foregoing reasons, we hold that Mr. Wadsworth pleaded a loss of chance case, which is not recognized in Maryland. Consistent with the plain language and legislative history of CJ § 3-902(a), principles of *stare decisis*, and our decisions in *Weimer* and *Fennell*, we hold that the plaintiff in a wrongful death claim bears the burden of proving, by a preponderance of the evidence, that the defendant's negligence proximately caused the decedent's death. Accordingly, we affirm the Court of Special Appeals regarding Mr. Wadsworth's wrongful death claim.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONERS.**

25

Circuit Court for Baltimore County
Case No. 03-C-18-003707
Argued: February 8, 2022

IN THE COURT OF APPEALS

OF MARYLAND

No. 40

September Term, 2021

_____

SCOTT WADSWORTH, ET AL.

v.

POORNIMA SHARMA, ET AL.

_____

*Getty, C.J.
*McDonald
Watts
Hotten
Booth
Biran
Harrell, Glenn T., Jr., (Senior
Judge, Specially Assigned),

JJ.

_____

Dissenting Opinion by Watts, J., which Harrell,
J., joins.

_____

Filed: July 15, 2022

*Getty, C.J., and McDonald, J., now Senior
Judges, participated in the hearing and
conference of this case while active members of
this Court. After being recalled pursuant to Md.
Const., Art. IV, § 3A, they also participated in
the decision and adoption of this opinion.

Respectfully, I dissent. The issue in this case is not whether Maryland's Wrongful Death Act provides a remedy for a negligent act where a person has less than a 50/50 chance of survival, *i.e.*, a loss of chance of survival case. Rather, the issue in this case is whether Maryland's Wrongful Death Act applies where the negligent act of a medical professional causes the death of a person who had a greater than fifty percent chance of survival at the time of death. The clear answer under the plain language and legislative history of the Wrongful Death Act is that it does, and I would hold as such.

Under the plain language of the Wrongful Death Act, the Wadsworth family's wrongful death claim survives summary judgment. Maryland's Wrongful Death Act, Md. Code Ann., Cts. & Jud. Proc. (1974, 2020 Repl. Vol.) ("CJ") §§ 3-901 to 3-904, provides a certain class of persons, including the "wife, husband, parent, and child" of a decedent, CJP § 3-904(a)(1), with a cause of action "against a person whose wrongful act **causes** the death of" that decedent. CJP § 3-902(a) (emphasis added). In order to satisfy the causation requirement inherent in the statute, a defendant's wrongful act must be the proximate cause of the decedent's death; in other words, a plaintiff must establish that it is "more probable than not that the defendant's negligence caused the alleged injury." Marcantonio v. Moen, 406 Md. 395, 415, 959 A.2d 764, 776 (2008) (citations omitted).

In this case, the Wadsworths produced expert testimony that to a reasonable degree of medical probability but for Dr. Poornima Sharma's failure to diagnose and treat Stephanie Wadsworth in April 2013, Ms. Wadsworth would not have died in June 2017 but instead would have lived an additional eighty months from April 2013 until approximately December 2019 or January 2020. Stated differently, the Wadsworths

produced evidence that Ms. Wadsworth possessed a greater than fifty percent chance of surviving for at least six years and eight months from April 2013—two and a half years longer than she lived—but for Dr. Sharma's alleged negligent failure to treat in April 2013. Taking the evidence in the light most favorable to the Wadsworths, a genuine dispute of material fact existed as to whether Dr. Sharma's alleged negligent failure to treat Ms. Wadworth's cancer caused her death in June 2017.

The holdings of this Court in Weimer v. Hetrick, 309 Md. 536, 539, 525 A.2d 643, 644–45 (1987) and Fennell v. S. Maryland Hosp. Ctr., Inc., 320 Md. 776, 778-79, 580 A.2d 206, 207 (1990) pose no bar to the Wadsworth family's claim. To understand why neither Weimer nor Fennell control, it is necessary to examine the facts and holdings of each case. In Weimer, 309 Md. at 552-53, 525 A.2d at 651, this Court declined to depart from the longstanding principle that in order to recover in a wrongful death case, a plaintiff must establish that the defendant's wrongful act was the proximate cause of the decedent's death. In Weimer, Jody Ann Henrick, who was pregnant at the time, was admitted to the hospital and agreed to undergo an emergency caesarian section following a determination that "she was a very early severe eclamptic[]" with full knowledge that at 32-weeks' gestation, the child might possess "only a poor chance of survival." Id. at 539, 525 A.2d at 644-45. Tragically, the baby died just a few hours after birth. See id. at 538-39, 525 A.2d at 644.

Subsequently, the baby's parents filed malpractice claims in connection with their son's death including a claim by Jody Hetrick acting as personal representative of her son's estate and a wrongful death action by the mother and father. See id. at 541, 525 A.2d at 645-46. An expert witness, Dr. Kenneth L. Harkavy, testified on behalf of the parents that

Dr. Weimer, who was charged with observing the child following birth, had engaged in conduct that fell below the applicable standard of care and that absent his negligent conduct, the child's chance of survival was "good." Id. at 540, 525 A.2d at 645. An autopsy revealed, though, that "a combination of eclampsia plus general anesthesia led to fetal anoxia and the pathologic changes observed." Id. at 540, 525 A.2d at 645. And Dr. Judith Gieske, a pediatrician who testified for Dr. Weimer, "concluded that Dr. Weimer met the standard expected of him and did nothing that caused or contributed to the baby's death." Id. at 541, 525 A.2d at 645. At trial, the circuit court instructed the jury on causation in part that "if there are two or more causes, either of which could have resulted in the baby's death . . . then the plaintiffs have to prove by evidence more likely so than not that the acts for which the pediatrician is responsible in fact caused the baby's death." Id. at 542-43, 525 A.2d at 646. The circuit court explained:

> But if you should find that Dr. Weimer was responsible for the lack of oxygen and that was 50% of the cause of the death and if you feel that the prematurity was 50% of the cause of death, then that's the standoff again. We got two causes of action. There are two possible causes of death that are both equal. If that's the case, the plaintiff hasn't done what the law requires and you must find in favor of the doctor. The plaintiff has to show that the act for which the doctor is responsible for is better than 50%, 51%. That's better.

Id. at 543, 525 A.2d at 646-47. Counsel for the Hetricks took issue with this instruction on the ground that based on Thomas v. Corso, 265 Md. 84, 102, 288 A.2d 379, 389-90 (1972) "all that the plaintiff need prove is that the actions of Dr. Weimer took away a substantial possibility that this baby would have survived with appropriate resuscitation." Weimer, 309 Md. at 543, 525 A.2d at 647.

Following a jury verdict in favor of Dr. Weimer, the Hetricks appealed to the Court

of Special Appeals, which affirmed in part and reversed in pertinent part as to the circuit court's instruction on causation. See id. at 542, 525 A.2d at 646. The Court of Special Appeals held that based on language from Hicks v. United States, 368 F.2d 626, 632 (4th Cir. 1966) quoted in Thomas, 265 Md. at 102, 288 A.2d at 389-90, the plaintiffs needed only to establish "that Dr. Weimer's failure to do what was reasonable, proper, necessary and appropriate to resuscitate Jason deprived the child of a substantial possibility of survival." Id. at 542, 525 A.2d at 646. The relevant language in Thomas stated that "[i]f there was any substantial possibility of survival and the defendant has destroyed it, he is answerable[,]" and that "[t]he law does not in the existing circumstances require the plaintiff to show to a *certainty* that the patient would have lived had she been hospitalized and operated on promptly." Weimer, 309 Md. at 544, 525 A.2d at 647 (quoting Thomas, 265 Md. at 102, 288 A.2d at 389-90 (emphasis in original)).

After granting *certiorari*, we declined to consider "the question [of] whether Maryland recognizes the loss of a substantial chance of survival as a measure of damages or as a separate tort" because it was unpreserved. Id. at 545, 525 A.2d at 648. Instead, after conducting a review of relevant case law, we reiterated what was already well-established at the time—that the well-settled rule applicable to a wrongful death action is that a plaintiff must establish by a preponderance of the evidence that the negligent act was the cause of the death. See id. at 547-50, 525 A.2d at 649-50.

Next, in Fennell, 320 Md. 776 at 794, 580 A.2d at 215, we reiterated the principles from Weimer and declined to recognize loss of chance damages in a survival action. The case involved the death of a woman, Cora L. Fennell, who was admitted to the hospital in

the early hours of the morning after doctors determined that her condition was critical, consulted with a neurologist, and performed a CT scan.  See id. at 778-79, 580 A.2d at 207. Later that morning, Ms. Fennell arrested, which left her on life support, and tragically, she passed away the next day following a second arrest.  See id. at 779, 580 A.2d at 208. Evidence demonstrated that Ms. Fennell was left alone in her room from the time she was admitted up until a few minutes before her first arrest.  See id. at 779, 580 A.2d at 208.  An autopsy revealed Ms. Fennell died of meningitis.  See id. at 779, 580 A.2d at 208.  Ms. Fennell's spouse and children thereafter filed medical malpractice claims against the hospital including a wrongful death and a survival claim.  See id. at 778, 580 A.2d at 207. The testimony of an expert was that Ms. Fennell "had a 40% chance of surviving the meningitis, but that the chance was lost as a result of the Hospital's negligence."  Id. at 780, 580 A.2d at 208.  Significantly, there was no testimony that Ms. Fennell's chance of survival would have been greater than 50% but for the alleged negligence.  See id. at 780, 580 A.2d at 208.

Recognizing that under the holding in Weimer "in a wrongful death case, a plaintiff must prove to a reasonable medical probability that death was proximately caused by the defendant's negligence" prohibited the wrongful death claim, the Fennells did not appeal the award of summary judgment with respect to the wrongful death claim.  Fennell, 320 Md. at 780, 580 A.2d at 208.  Instead, the Fennells contended that "Maryland courts have left open the issue of whether loss of chance is compensable in a survival action where the degree of proof that death was caused by negligence does not meet the 'more likely than not' standard[]" and urged this Court to permit damages in such a case.  Id. at 781, 580

A.2d at 208.  In considering the issue, this Court explained:

> Negligent treatment resulting in a loss of chance of survival may or may not eliminate all chance of survival or recovery.  If the chance of recovery is 40%, as in the instant case, the risk of non-recovery must be 60%; and the loss of the 40% chance of recovery increased the risk of non-recovery to 100%.  Thus, the loss of a 40% chance of recovery in this case eliminated all chance of recovery.  It is also conceivable that negligent treatment may result in loss of a chance of survival without eliminating all chance of survival.  For example, if the patient had a 40% chance of recovery and negligent treatment reduced the patient's chance of survival to 10%, then the actual loss of chance of survival would be 30%.  By loss of chance, we mean the net loss of chance of survival directly attributable to the negligence.

Id. at 781, 580 A.2d at 208-09.  In addition, this Court stated that Weimer did not address "whether loss of chance damages might be recoverable in a survival action." Fennell, 320 Md. at 783, 580 A.2d at 210.

The facts of Weimer and Fennell differ substantially from the facts of this case, which does not involve a loss of chance of survival claim.  In both Weimer and Fennell, the decedents perished within hours of the wrongful acts at issue.  In other words, death was imminent and in Fennell, the loss of chance case, the chance of survival was indisputably less than fifty percent.  By contrast, Ms. Wadsworth died in June 2017, four years after Dr. Sharma's alleged negligent failure to treat in April 2013 and the Wadsworth family produced expert opinion that at the time of her death but for the alleged negligence Ms. Wadsworth had a greater than fifty percent chance of survival for a longer period of time.  Unlike in Weimer and Fennell where the plaintiffs presented probabilities that the decedents *would* have survived but for the negligent acts, there is no question that Ms. Wadsworth *did* survive for at least four years after the alleged negligent act and the Wadworths produced expert testimony indicating that she had a greater than fifty percent

chance of survival for additional years. In other words, the Wadsworths produced evidence in support of the conclusion that at the time of her death Ms. Wadsworth had a greater than fifty percent chance of continued survival, *i.e.*, the Wadsworths produced evidence that Dr. Sharma's negligent failure to treat was the proximate cause of Ms. Wadsworth's death in June 2017. As such, neither the holding in Weimer nor Fennell is applicable and the principle of *stare decisis* poses no obstacle to the viability of the Wadsworths' wrongful death action.

Put simply, this is not a loss of chance case. Loss of chance of survival is defined as "decreasing the chance of survival as a result of negligent treatment where the likelihood of recovery from the preexisting disease or injury, prior to any alleged negligent treatment, was improbable, i.e., 50% or less." Marcantonio, 406 Md. 395, 415, 959 A.2d 764, 776 (2008) (quoting Fennell, 320 Md. at 781, 580 A.2d at 208). The evidence in this case demonstrates that the failure to treat decreased Ms. Wadsworth's chance of survival of six years and eight months from greater than fifty percent to less than fifty percent. Stated differently, it was more likely than not that Ms. Wadsworth would have survived for at least six years and eight months but for the negligence in this case. The Wadsworths are not seeking damages for a mere possibility of survival but instead for the probability that a failure to diagnose caused Ms. Wadsworth to die in June 2017 at a time that she otherwise would not have.

This Court has previously recognized that facts similar to those in this case do not always implicate Weimer and Fennell. In Marcantonio, 406 Md. at 414, 959 A.2d at 775 this Court reversed a grant of summary judgment because there was a genuine dispute as

to whether a doctor's failure to perform a procedure was the proximate cause of a woman's death from cancer. In August 2000, Dr. Moen failed to perform a biopsy after Sherri Schaefer complained of heavy vaginal bleeding. See id. at 398, 959 A.2d at 765-66. Ms. Schaefer's condition did not improve and upon performing the biopsy in April 2001, Dr. Moen discovered that Ms. Schaefer had endometrial cancer. See id. at 398, 959 A.2d at 765-66. Although Ms. Schaefer underwent treatment, she died in 2005. See id. at 399, 959 A.2d at 766. In a subsequent wrongful death action, Ms. Schaefer's family, the Marcantonios, argued that Dr. Moen's failure to perform the biopsy in August 2000 was a negligent act that caused Ms. Schaefer's death. See id. at 399, 959 A.2d at 766. In a deposition on behalf of the Marcantonios, Dr. Hutchins, an expert, stated, among other things, that Ms. Schaefer had an eighty percent chance of survival had she been diagnosed in August or September of 2000, and that her doctor breached a duty. See id. at 399-400, 959 A.2d at 766. In an affidavit, Dr. Hutchins stated:

> This will confirm that I hold the following opinion within a reasonable degree of medical probability: Dr. Moen's failure to properly diagnose Ms. Scheaffer's [sic] condition as an early carcinoma of the uterus, and/or a precancerous lesion and/or some form of hyperplasia in August or September of 2000 and the resultant failure to begin immediate treatment were the proximate cause of Ms. Scheaffer's [sic] death.

Id. at 400, 959 A.2d at 767 (brackets in original). In another deposition, a second expert, Dr. Shmookler, declined to opine as to Ms. Schaefer's prognosis in 2001, when treatment began, but noted that had treatment begun in 2000, the condition was likely curable, and stated the following in an affidavit:

> I have reviewed the pathology slides of the decedent, Sherri Scheaffer [sic], as well as the original endometrial biopsy and other medical records. I

- 8 -

provided a deposition at the request of the defendants to this action.... The failure to properly evaluate the ovarian tumor of Sherri Scheaffer [sic] in September of 2000, when it was in an early stage, was a substantial factor in proximately causing her death.

Id. at 402, 959 A.2d at 768 (brackets and ellipsis in original). The trial court granted the defendant's motion to strike the expert affidavits on the grounds that they contradicted the depositions, and thereafter granted the defendant's motion for summary judgment, finding that the Marcantonios failed to establish proximate cause and, specifically, that "the case of *Fennell v. Southern Maryland Hospital,* 320 Md. 776 [580 A.2d 206], is controlling in the sense that the [Marcantonios], even assuming the things that have been pointed out in the depositions, have not offered evidence that would establish proximate causation of 51 percent or more of the chance of loss ... of survival." Marcantonio, 406 Md. at 403, 959 A.2d at 768 (alterations and ellipsis in original). A divided panel of the Court of Special Appeals affirmed, determining that "without the affidavits of Drs. Shmookler and Hutchins, summary judgment was appropriate because the evidence, taken in a light most favorable to the Marcantonios, showed only a possibility that [t]he Medical Providers' negligence caused Ms. Schaefer's death." Id. at 404, 959 A.2d at 769 (cleaned up). In a dissent, the Honorable Timothy E. Meredith explained that based on the evidence "a rational trier of fact could conclude that the defendants' negligence was the probable cause of the patient's death." Marcantonio v. Moen, 177 Md. App. 664, 698, 937 A.2d 861, 881 (2007) (Meredith, J., dissenting).

After granting *certiorari*, this Court determined "that the affidavits of Drs. Hutchins and Shmookler do not materially contradict their respective deposition testimony within

the meaning of Rule 2–501(e)[,]" and that accordingly, the trial court "erroneously entered summary judgment on the basis that the Marcantonios failed to establish sufficient evidence of proximate cause." Marcantonio, 406 Md. at 409, 414, 959 A.2d at 772, 775. This Court explained that the affidavits and deposition testimony created a factual dispute as to whether it was "more probable than not that the defendant's negligence caused the alleged injury." Id. at 415, 959 A.2d at 776 (citations omitted). Importantly, this Court made clear that the claim was not a loss of chance claim because Ms. Schaefer possessed "a chance of survival exceed[ing] 50 percent." Id. at 415, 959 A.2d at 776. Here, as in Marcantonio, this is not a loss of chance case because Ms. Wadsworth possessed a chance of survival that was greater than fifty percent at the time of her death.

Like many Marylanders, Ms. Wadsworth lived with cancer. To deny recovery in cases where plaintiffs can establish a greater than fifty percent chance of survival at the time of death—merely because there is no ultimate cure for the preexisting condition—is an arbitrary line to draw and an inappropriate application of Maryland case law—namely, the Weimer and Fennell cases. A hypothetical illustrates well the problem with this approach. In a wrongful death case based on medical negligence, where there is no preexisting medical condition and the decedent is a sixty-year-old woman who is a resident of Baltimore County—and life expectancy tables show a life expectancy of 80.9 years—if the wrongful death action were successful as to liability, the life expectancy of 20.9 years

would be used as a potential measure for assessing damages.[1]  See Md. Dep't of Health Vital Statistics Admin., Maryland Vital Statistics Annual Report 71 (2018), https://health. maryland.gov/vsa/Documents/2018Annual.pdf [https://perma.cc/A4N4-8BJG].  The expectation would be that the plaintiff would have probably lived for an additional 20.9 years and at the end of the time frame died.  In this case, testimony demonstrates that but for the alleged negligent failure to treat, Ms. Wadsworth would have lived until December of 2019 or January of 2020.  In other words, Ms. Wadsworth would have lived two and a half years beyond her death in June 2017.  There is no difference between the hypothetical and this case in that the Wadsworths have supplied specific evidence of life expectancy through expert testimony as opposed to the life expectancy tables.  Yet, under the Majority's view, Ms. Wadsworth's family cannot recover at all even though she had a greater than fifty percent chance of survival at the time of her death because she was destined to perish at a point in the future from cancer, instead of an unknown cause.

Under the Majority's approach, the Wadsworths sustained an injury for which there exists no remedy.  See Maj. Slip. Op. at 24-25.  In the past, where this Court has found a "void" in the law or the possibility of injury without recovery, the Court has acted to fill the gap.  Cooper v. Rodriguez, 443 Md. 680, 723, 118 A.3d 829, 854 (2015) (recognizing gross negligence as an exception to common law public official immunity given that a failure to recognize the exception would create "a void in liability, leaving plaintiffs . . .

---

[1]Courts often take judicial notice of life expectancy tables for purposes of damage valuation.  See Byrum v. Maryott, 26 Md. App. 130, 131-32, 337 A.2d 142, 143 (1975).

without a remedy for a public official's gross negligence."). In this case, rather than act to fill a void and achieve an equitable result, the Majority has applied case law in a manner that creates the void, by applying the holdings of Weimer and Fennell in a way in which neither case was intended to be used and preventing families with terminally ill relatives from recovering in wrongful death actions. As the Maryland Hospital Association indicates in an amicus brief, Marylanders receive exceptional oncology care. Because of this standard of care and advances in technology, cancer mortality rates continue to decline for adults. See U.S. Dep't of Health & Human Servs. Nat'l Cancer Inst., Annual Report to the Nation 2021: Overall Cancer Statistics, https://seer.cancer.gov/report_to_nation/ statistics.html [https://perma.cc/AGW7-FCGM]. Hopefully, this downward trend will continue. But such a result will only intensify the arbitrary distinction inherent in the majority opinion's insistence that only the families of those with curable preexisting conditions may recover in wrongful death actions. See Maj. Slip. Op. at 24-25. Perhaps, the Majority does not intend its opinion to entirely preclude families of relatives with terminal illnesses from ever recovering in a wrongful death action. The Majority's rationale raises the question of how long would be long enough for long-term survival. Would the family of a patient who would not have been cured of cancer, but—through advances in medicine—would have survived for ten years, rather than two and a half years, be able to recover?

Although Majority states that "the lack of any recent legislation, aside from extending the time frame which plaintiffs can bring a claim, does not contradict [its] reading of CJ § 3-902(a)[,]" that is plainly not the case. Maj. Slip Op. at 13. The

- 12 -

circumstance that in 1971 the General Assembly extended the time frame to bring a wrongful death action to three years and has not enlarged the time frame since is completely unrelated to the issue in this case—namely, whether the family of a person with a pre-existing terminal illness may bring a wrongful death action where the person had a greater than fifty-one percent chance of survival but for the negligent act. The absence of any action by the General Assembly does not constitute legislative history. We have stated that "[b]ecause a bill might fail for a myriad of reasons, the bill's failure is a rather weak reed upon which to lean in ascertaining the General Assembly's intent." NVR Mortg. Fin., Inc. v. Carlsen, 439 Md. 427, 438, 96 A.3d 202, 208 (2014) (cleaned up). In this case, the majority opinion does not rest its legislative history claim on even the weak reed of a failed bill but rather on the General Assembly's silence or its potential inability to anticipate the manner in which the Majority might expand the holdings in Weimer and Fennell.

In addition, although the Majority states that it "presume[s] that the General Assembly is aware of this Court's interpretation of its enactments and, if such interpretation is not legislatively overturned, to have acquiesced in that interpretation[,]" this observation does not apply here. Maj. Slip Op. at 13. Even though the Majority indicates that the General Assembly would be aware of its interpretation of Weimer and Fennell and suggests that the General Assembly has somehow acquiesced to its holding in this case, nothing could be further from accurate. This Court's holding in Weimer, where a patient had less than a fifty percent chance of survival, was that, under the Wrongful Death Act, a patient's family must show by a preponderance of the evidence that the conduct of a defendant was negligent and that such conduct was a proximate cause of death. And, in Fennell, this

Court's holding was limited to the circumstance of a loss of chance of survival case involving a patient who had less than a fifty percent chance of survival. In other words, this Court has never interpreted the Wrongful Death Act in the manner in which the Majority does now to preclude its application to a person who has a greater than fifty percent chance of survival at the time of death. In other words, the General Assembly could not have been aware of, let alone have acquiesced to, the Majority's present interpretation of the Act.

At bottom, the problem with the Majority's conclusion is that there is absolutely no legislative history that supports the holding that the Majority has reached in this case. Given the Majority's holding, though, it may well be that the General Assembly will want to review the issue of whether the Wrongful Death Act applies where terminally ill patients are the subject of medical negligence and have a greater than fifty percent chance of survival at the time of death. In other words, it may be that the General Assembly will want to consider whether there should be a cause of action under the Wrongful Death Act to account for situations where terminally ill patients suffer injury.[2]

---

[2]A recent survey notes that twenty-four jurisdictions have adopted the loss of chance doctrine while seventeen, including Maryland, reject it. See Lauren Guest, David Schap, Thi Tran, The "Loss of Chance" Rule As A Special Category of Damages in Medical Malpractice: A State-by-State Analysis, J. Legal Econ., April 2015, at 53, 59. The study reports that four jurisdictions have deferred consideration and five have not yet considered the matter. See id. Since the publication of this study, Hawaii, previously a jurisdiction which had not yet considered it, endorsed the doctrine, see Est. of Frey v. Mastroianni, 463 P.3d 1197, 1200 (Haw. 2020), and North Carolina, also a state which had not previously addressed this issue, rejected it, see Parkes v. Hermann, 852 S.E.2d 322, 322-23 (N.C. 2020). Maryland's position among a minority of jurisdictions may provide reason for the General Assembly to consider the issue.

Having explained that the Wadworths' claim is not prohibited under Maryland's Wrongful Death Act and that *stare decisis* poses no bar, in my view, there is no valid reason for not allowing the claim to proceed. Although the Maryland Hospital Association suggests that claims and insurance costs will increase, this argument presumes that hospitals and providers are negligent in the first instance. As discussed, in order to survive summary judgment, a plaintiff must demonstrate both a wrongful act and causation. See CJP § 3-902(a).

From my perspective, in addition to being at odds with Maryland case law, the failure to recognize this cause of action presents significant concerns. The majority opinion sends a message to healthcare providers that there is less accountability for negligently treating individuals suffering from illnesses from which they will not recover, even as medicine advances and periods of survival become longer. Considering that forty percent of men and women will be diagnosed with cancer at some point in their lives, the Majority's approach may well close the door to recovery for many Maryland families who have relatives who may experience a breach in the standard of care in medical treatment.

For the above reasons, respectfully, I dissent.

Judge Harrell authorizes me to state that he joins in this opinion.